**IN THE UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF NEW YORK**

| | |
|---|---|
| SAFE HAVEN HOME CARE, INC., EVERGREEN HOMECARE SERVICE OF NY INC., ELIM HOME CARE AGENCY, LLC, DHCARE HOMEHEALTH, INC., SILVER LINING HOMECARE AGENCY, AND ANGEL CARE, INC. | ) ) ) ) ) ) )  Civil Action No.: |
| Plaintiffs, | ) |
| v. | ) ) |
| UNITED STATES DEPARTMENT OF HEALTH AND HUMAN SERVICES, XAVIER BECERRA, in his official capacity as Secretary of the United States Department of Health and Human Services, UNITED STATES CENTERS FOR MEDICARE & MEDICAID SERVICES, CHIQUITA BROOKS-LASURE, in her official capacity as Administrator of the U.S. Centers for Medicare and Medicaid Services, NEW YORK STATE DEPARTMENT OF HEALTH, MARY T. BASSETT, in her official capacity as Commissioner of the New York State Department of Health, BRETT R. FRIEDMAN, in his official capacity as Medicaid Director of the New York State Department of Health | ) ) ) ) ) ) ) ) ) ) ) ) ) ) ) ) ) ) ) |
| Defendants. | ) ) |

---

**MEMORANDUM OF LAW IN SUPPORT OF ORDER TO SHOW CAUSE FOR A
TEMPORARY RESTRAINING ORDER, PRELIMINARY INJUNCTION, AND
EXPEDITED BRIEFING SCHEDULE**

## <u>TABLE OF CONTENTS</u>

INTRODUCTION ............................................................................................................................1

BACKGROUND ............................................................................................................................2

    A.  ARPA, Section 9817 ...................................................................................................2

    B.  The Medicaid Program .............................................................................................4

    C.  Actuarially Sound Rates & Directed Payments ......................................................5

    D.  New York State Department of Health's First Directed Payment .....................6

STANDARD OF REVIEW ............................................................................................................7

ARGUMENT ..................................................................................................................................8

    A.  Plaintiffs Will Suffer Irreparable Harm ..................................................................8

    B.  Plaintiffs Are Likely To Succeed on the Merits ...................................................11

    C.  The Balance of Equities and Public Interest Favor Preliminary Relief ..........15

CONCLUSION..............................................................................................................................15

## **TABLE OF AUTHORITIES**

**CASES**                                                                                          Page

*Andino v. Fischer*, 555 F.Supp.2d 418 (S.D.N.Y. 2008) ...............................................................7

*Behihana, Inc. v. Behihana of Tokyo*, 784 F.3d 887 (2d Cir. 2015) ..........................................7

*Borey v. Nat'l Union Fire Ins. Co.*, 934 F.2d 30 (2d Cir. 1991) ................................................11

*Faiveley Transp. Malmo AB v. Wabtec Corp.*, 559 F.3d 110 (2d Cir. 2009) ............................8

*Harris v. McRae*, 448 U.S. 297 (1980) .......................................................................................4

*Linares Huarcaya v. Mukasey*, 550 F.3d 224, 229 (2d Cir. 2008) ...........................................13

*Make the Road New York v. Cuccinelli*, 419 F.Supp.3d 647 (S.D.N.Y. 2019) ........................10

*New York v. U.S. Dep't of Homeland Sec.*, 969 F.3d 42 (2d Cir. 2020)......................................7

*New York v. U.S. Dep't of Homeland Sec.*, 475 F.Supp. 3d 208 (S.D.N.Y. 2020)......................8

*Nken v. Holder*, 556 U.S. 418, 129 S.Ct. 1749, 173 L.Ed.2d 550 (2009)............................7, 15

*Regeneron Pharms., Inc. v. U.S. Dep't of Health and Human Sers.*, 510 F.Supp. 3d 29
      (S.D.N.Y. 2020) ...............................................................................................................9, 10

*Robinson Knife Mfg. Co. v. Comm'r of Internal Revenue*, 600 F.3d 121
      (2d Cir. 2010)........................................................................................................................14

*Salinger v. Colting*, 607 F.3d 68 (2d Cir. 2010) .........................................................................8

*Tom Doherty Assocs., Inc. v. Saban Entm't, Inc.*, 60 F.3d 27 (2d Cir. 1995).............................9

*United States v. New York*, 708 F.2d 92 (2d Cir. 1983).............................................................11

*United States v. Suarez*, 880 F.2d 626, 630 (2d Cir. 1989) ......................................................11

*Williams v. Rosenblatt Sec., Inc.*, 136 F. Supp. 3d 593 (S.D.N.Y. 2015)....................................7

*Winter v. Natural Res. Def. Council, Inc.*, 555 U.S. 7 (2008) ...........................................7, 8, 11

**STATUTES AND RULES**

ARPA § 9817............................................................................................................... *passim*

5 U.S.C. § 702.....................................................................................................................11

42 U.S.C. § 1396....................................................................................................... *passim*

42 C.F.R. § 438 .................................................................................................. *passim*

CMS Final Rule, 81 FR 27498, May 6, 2016 ..............................................................5

## OTHER AUTHORITIES

"2022-23 Executive Budget Briefing and Questions and Answers," (Feb. 2022)
     available at
     https://www.health.ny.gov/health_care/medicaid/redesign/2022/docs/2022-
     23_exec_budget_presentation.pdf ...............................................................10

CMCS Informational Bulletin, "Medicaid Managed Care Options in Responding to
     COVID-19," (May 14, 2020), available at https://www.medicaid.gov/federal-
     policy-guidance/downloads/cib051420.pdf ....................................................13

"Long Term Care Workforce and Value-Based Payment Readiness Implementation
     Provider Webinar," (Jan. 2022), available at
     https://nyshcp.org/common/Uploaded%20files/Public%20Policy/DSRIP-VBP-
     MRT/LTC%20Workforce%20VBP%20Slides.pdf..................................................8, 12

"Managed Long Term Care Rate Development" (Mar. 22, 2018), available at
     https://hca-nys.org/wp-content/uploads/2018/03/DOH-HCA-Presentation-03-22-
     18.pdf ..........................................................................................................14

"MTR II Executive Summary of Proposals" (Mar. 19, 2020), available at
     https://health.ny.gov/health_care/medicaid/redesign/mrt2/docs/2020-03-
     19_executive_summary_of_proposals.pdf ....................................................10

State Medicaid Director Letter #21-001, "RE: Additional Guidance on State Directed
     Payments in Medicaid Managed Care," (Jan. 8, 2021), available at
     https://www.medicaid.gov/Federal-Policy-Guidance/Downloads/smd21001.pdf ..........4

State Medicaid Director Letter #21-003, "RE: Implementation of American Rescue Plan
     Act of 2021 Section 9817: Additional Support for Medicaid Home and
     Community-Based Services during the COVID-19 Emergency," (May 13,
     2021), available at https://www.medicaid.gov/Federal-Policy-
     Guidance/Downloads/smd21003.pdf............................................................10

https://www.health.ny.gov/funding/rfo/20039/ .........................................................10

## <u>INTRODUCTION</u>

The New York State Department of Health ("NYSDOH") is poised to pay $361 million to the largest one-third of Licensed Home Care Services Agencies ("LHCSAs") providing services to Medicaid beneficiaries in New York State. The funding—a combination of enhanced federal funding from the American Rescue Plan Act of 2021 ("ARPA") and equivalent State funds—was designed by Congress to give additional support for providers rendering Medicaid Home and Community-Based Services ("HCBS") during the COVID-19 emergency and to "enhance, expand, or strengthen" HCBS in the years that follow. ARPA § 9817.

Although by federal statute and regulation, the NYSDOH must implement these funds fairly and in a manner that gives a "class of providers" expenditures equally, and using the same terms of performance, it has done no such thing. Rather, continuing a long-standing effort by the NYSDOH to eliminate providers from the New York Medicaid market, it has turned the blessing of extra federal funds into a weapon to be wielded against the majority of LHCSAs in New York, threatening their very existence.

While these enhanced HCBS funds should operate as a rising tide that lifts ***all*** boats, the NYSDOH is improperly and unlawfully directing hundreds of millions of dollars to specific providers, thereby deciding which LHCSAs will rise and which LHCSAs remain at shore.

As the first $361 million will be paid by the NYSDOH on March 31, 2022, a temporary restraining order is necessary to maintain the status quo and to prevent irreparable harm that will flow to Plaintiffs if their direct competitors receive an influx of millions of dollars to be used by those competitors to "fund recruitment, retention, and training for personal care aides, home health aides, and nurses." Plaintiffs will lose workers, be unable to fulfill their clients' service needs, and struggle to survive.

Moreover, smaller LHCSAs, such as Plaintiffs, provide personalized care in a way that many larger agencies cannot and often arise to serve unique populations of beneficiaries.  Not only will this first directed payment irreparably harm Plaintiffs, but their culturally diverse populations of members will also suffer. For example, Plaintiff Safe Haven Home Care uniquely caters to the Creole and Hispanic community that includes persons from Haiti or of Haitian descent, similarly Plaintiff Angel Care serves the LatinX and Southeast Asian communities and employs direct care workers that speak Punjabi, and Plaintiff Silver Lining Homecare Agency's staff speaks Ukranian, Hebrew, Yiddish, Tajik, Farsi, Armenian, and other languages. Declaration of Rouandy Pascal in Support of Plaintiffs' Motion for Temporary Restraining Order and Preliminary Injunction ("Pascal Decl."), ¶¶ 13-14;  Declaration of Marina Piavskaia in Support of Plaintiffs' Motion for Temporary Restraining Order and Preliminary Injunction ("Piavskaia Decl."), ¶ 10; Declaration of Jacob Joffe in Support of Plaintiffs' Motion for Temporary Restraining Order and Preliminary Injunction ("Joffe Decl."), ¶¶ 8-10.  The impending exodus of workers from culturally diverse LHCSAs like Plaintiffs to larger LHCSAs soon able to offer higher pay, better benefits, and improved technology from ARPA funding will make it impossible for the culturally diverse LHCSAs to continue serving their unique populations.

## BACKGROUND

### A.  ARPA, Section 9817

ARPA, Pub. L. No. 117-2, was signed into law on March 11, 2021 and provided $1.9 trillion in federal funding for a range of programs to address the public health and economic crisis created by the COVID-19 pandemic.  Section 9817 of ARPA is titled "Additional Support for Medicaid Home and Community-Based Services During the Covid-19 Emergency" and

provides for a ten percent increase in the Federal Medical Assistance Percentage ("FMAP") with respect to expenditures for HCBS between April 1, 2021 and March 31, 2022 (the "Improvement Period").  This includes services such as home health care, personal care, case management, rehabilitation, and others.

Increased FMAP funds must be used by the State to supplement, as opposed to supplant, existing State funding for HCBS, and must be used to implement or supplement the implementation of one or more activities to enhance, expand, or strengthen HCBS under the State Medicaid program.  ARPA § 9817(b).

The State's enhanced funds are generated during the Improvement Period based on HCBS spending, however the State may expend these funds at any time prior to March 31, 2024. The NYSDOH has estimated that it will generate $2.15 billion in federal funds from its HCBS spending during the Improvement Period.  In addition, the State must use the state funds equivalent to the amount of the enhanced FMAP (*i.e.*, $2.15 billion in State funds) to implement or supplement the implementation of one or more activities to enhance, expand, or strengthen HCBS.

While ARPA provides for enhanced FMAP funding, State Medicaid programs are still bound by the Medicaid Statute and regulations promulgated by the United States Centers for Medicare & Medicaid Services ("CMS") when implementing these funds.  As CMS explained in guidance dated May 13, 2021, SMD# 21-003, concerning implementation of Section 9817, "these initial and quarterly HCBS spending plan and narrative requirements do not supersede any

authorization requirements that apply to section 1915(c) waivers, other Medicaid HCBS authorities, including section 1115 demonstrations, and managed care authorities."[1]

In addition, States must obtain approval from CMS for their spending plan of ARPA funds, and comply with other Medicaid spending requirements, such as obtaining pre-approval from CMS for any State directed payments pursuant to 42 C.F.R. § 438.6(c).

### B.  The Medicaid Program

The Medicaid Program, 42 U.S.C. § 1396, *et seq*., is a federal-state partnership created in 1965 to provide federal assistance to States for certain healthcare expenses for those of modest income.  It is operated by a single-State agency (here the NYSDOH), but overseen, regulated, and partially funded by the federal government, namely HHS and CMS.  "Although participation in the Medicaid program is entirely optional, once a State elects to participate, it must comply with the requirements of Title XIX."  *Harris v. McRae*, 448 U.S. 297, 301 (1980).

Many states, including New York State, operate their Medicaid Programs through managed care organizations ("MCOs").  MCOs are health insurance plans or health care systems that contract directly with the State and then, in turn, contract with health care providers to provide an adequate network of services for their Medicaid members.  MCOs are typically paid a capitated per-member-per-month fee by the State to cover services for their Medicaid members.

Managed Long Term Care ("MLTC") Plans are a type of MCO that cover a range of long-term care services to those who are chronically ill or disabled and wish to stay in their homes or communities.  The HCBS described above, and subject to ARPA's enhanced FMAP are among the long-term care services covered by MLTC Plans in New York.  Medicaid

---

[1] State Medicaid Director Letter #21-003, "RE: Implementation of American Rescue Plan Act of 2021 Section 9817: Additional Support for Medicaid Home and Community-Based Services during the COVID-19 Emergency," (May 13, 2021) at 8, available at https://www.medicaid.gov/Federal-Policy-Guidance/Downloads/smd21003.pdf.

Advantage Plus ("MAP") plans are another type of MCO that combine Medicaid and Medicare coverage, and likewise pay for HCBS subject to ARPA's enhanced FMAP.

### C.  Actuarially Sound Rates & Directed Payments

The Medicaid Statute, as well as regulations implemented by CMS, provide a host of requirements that apply to MCOs, as well as to States that utilize MCOs.  One such requirement, found in the Medicaid Statute at 42 U.S.C. § 1396b(m)(2)(A)(iii), is that States must make prepaid capitation payments to MCOs "on an actuarially sound basis."  This means rates that are projected to cover all reasonable, appropriate, and attainable costs that are required under the terms of the contract between the State and the MCO for the time period and population covered. 42 C.F.R. § 438.4.

Because capitated rates paid to the MCOs must be sufficient to cover all reasonable, appropriate, and attainable costs, States are prohibited from making pass-through payments to providers.  42 C.F.R. § 438.6(a).  Certain directed payments (*i.e.*, payments in which the State directs the MCO) are permitted, however those payments must meet specific criteria, and be pre-approved by CMS through what is known as a Directed Payment Section 438.6(c) Preprint Application. 42 C.F.R. § 438.6(c).  A directed payment which fails to comply with 42 C.F.R. § 438.6(c) is considered a pass-through payment.  Payments that fail to meet the "special contract provisions as specified in § 438.6" will not be approved as actuarially sound.  42 C.F.R. § 438.4(b)(7).

As CMS has explained, "Section 1903(m)(2)(A)(iii) of the Act requires contracts between states and MCOs to provide capitation payments for services and associated administrative costs that are actuarially sound.  The underlying concept of managed care and actuarial soundness is that the state is transferring the risk of providing services to the MCO and

is paying the MCO an amount that is reasonable, appropriate, and attainable compared to the costs associated with providing the services in a free market." CMS Final Rule, 81 FR 27498, at 27588, May 6, 2016. As such, states are "prohibited from making a supplemental payment to a provider through a managed care plan, which is referred to as a 'pass-through' payment." *Id*. 27589.

CMS provides for limited exceptions at 42 C.F.R. § 438.6(c)(1)(i)-(iii) which permit States to direct MCO payments to providers. One such exception is that the State may require MCOs to "implement value-based purchasing models for provider reimbursement, such as pay for performance arrangement, bundled payments, or other service payment models intended to recognize value or outcomes over volume of services." *Id*. § 438.6(c)(1)(i). Another exception permits the State to direct the MCO to "[p]rovide a uniform dollar or percentage increase for network providers that provide a particular service under the contract." *Id*. § 438.6(c)(1)(iii)(C). Prior to implementing any such plan, however, the State must obtain written approval from CMS. *Id.* § 438.6(c)(2)(ii). In addition, to obtain CMS approval, a "State must demonstrate, in writing, that the arrangement – (A) Is based on the utilization and delivery of services; [and] (B) Directs expenditures equally, and using the same terms of performance, for a class of providers providing the service under the contract," among other requirements. *Id*. § 438.6(c)(2)(ii)(A)-(B) (emphasis added).

### D.  New York State Department of Health's First Directed Payment

A fulsome discussion of the NYSDOH's ARPA Section 9817 plan, including changes that occurred to that plan, can be found at ¶¶ 48-70 of Plaintiffs' Complaint for Declaratory and Injunctive Relief. What is at issue for purposes of this motion is CMS' approval of the NYSDOH's Section 438.6(c) Preprint Application, in which it permitted the NYSDOH to make

a first directed payment of approximately $361 million in federal-state funding to be directed to the top one-third of LHCSAs, based solely on 2019 MLTC and MAP revenue.  It is expected that the NYSDOH will make this payment on March 31, 2022 to the MCOs, thereafter to be distributed in April to approximately 212 of the largest LHCSAs in New York State.

This motion requests that the Court issue a temporary restraining order and a preliminary injunction to enjoin the NYSDOH from making the first directed payment, as currently approved.

## STANDARD OF REVIEW

To obtain a preliminary injunction, a plaintiff "must establish that he is likely to succeed on the merits, that he is likely to suffer irreparable harm in the absence of preliminary relief, that the balance of equities tips in his favor, and that an injunction is in the public interest." *Winter v. Natural Res. Def. Council, Inc.*, 555 U.S. 7, 20 (2008); *see also Behihana, Inc. v. Behihana of Tokyo*, 784 F.3d 887, 895 (2d Cir. 2015) (describing four factor test).  A preliminary injunction may be "warranted on the strength of the[ ] first two factors alone." *New York v. U.S. Dep't of Homeland Sec.*, 969 F.3d 42, 86 (2d Cir. 2020).  Such relief is "designed to preserve the status quo and prevent irreparable harm until the court has an opportunity to rule on the lawsuit's merits." *Williams v. Rosenblatt Sec., Inc.*, 136 F. Supp. 3d 593, 616 n.11 (S.D.N.Y. 2015) (quotation markets omitted).  In addition, as is the case here, the balance of the equities and public interest "merge when the Government is the opposing party." *Nken v. Holder*, 556 U.S. 418, 435, 129 S.Ct. 1749, 173 L.Ed.2d 550 (2009).  Further, "[i]t is well established that in this Circuit the standard for an entry of a TRO is the same as for a preliminary injunction." *Andino v. Fischer*, 555 F.Supp.2d 418, 419 (S.D.N.Y. 2008).

## ARGUMENT

### A.  Plaintiffs Will Suffer Irreparable Harm

Irreparable harm is "the single most important prerequisite for the issuance of a preliminary injunction." *Faiveley Transp. Malmo AB v. Wabtec Corp.*, 559 F.3d 110, 118 (2d Cir. 2009).  Plaintiffs must show that "irreparable injury is *likely* in the absence of an injunction." *Winter*, 555 U.S.C at 22, 129 S.Ct. 365 (emphasis in original).  Irreparable harm must be "neither remote nor speculative, but actual and imminent." *Faiveley Transp.*, 559 F.3d at 118.  At the same time, however, "Plaintiffs need not show that irreparable harm already ha[s] occurred." *New York v. U.S. Dep't of Homeland Sec.*, 475 F.Supp. 3d 208, 226 (S.D.N.Y. 2020) (internal citations omitted).  "The relevant harm is the harm that (a) occurs to the parties' legal interests and (b) cannot be remedied after a final adjudication, whether by damages or a permanent injunction." *Salinger v. Colting*, 607 F.3d 68, 81 (2d Cir. 2010).

In the absence of injunctive relief, Plaintiffs here will suffer immediate, concrete, and irreparable harm.  This is for at least four reasons.  First, Plaintiffs will experience immediate competitive harm as soon as the first directed payment of $361 million is distributed to the larger LHCSAs next month.  Plaintiffs' direct competitors will have an influx of an average of nearly two million dollars each, which can be immediately put to work "to raise wages or incentivize recruitment of direct care workers and nursing staff providing, or supervising the provision of, personal care or nursing services."[2]  The money can also be used for signing bonuses to new employees, and a host of other competitively-advantageous purposes.[3]  Plaintiffs are *already* struggling with challenges caused by the COVID-19 emergency, including staffing shortages and

---

[2] "Long Term Care Workforce and Value-Based Payment Readiness Implementation Provider Webinar," (Jan. 2022), at 18, available at  https://nyshcp.org/common/Uploaded%20files/Public%20Policy/DSRIP-VBP-MRT/LTC%20Workforce%20VBP%20Slides.pdf.
[3] *Id.*

increased costs. *See* Pascal Decl. ¶ 14 ("Staffing for LHCSAs, including Safe Haven, is already

thin . . . Safe Haven lost ten employees who left the workforce for fear of COVID-19 and lost

fifteen employees because of the vaccine mandate."); Piavskaia Decl. ¶ 13 ("The COVID-19

pandemic brought additional challenges to the entire home care industry, including Angel Care,

heightening staffing shortages and increasing costs, such as to cover Personal Protective

Equipment."); Joffe Decl, ¶ 14.  In addition, larger LHCSAs already have advantages over

smaller LHCSAs, such as better rates and Value-Based Payment bonuses from the MLTCs.

Pascal Del. ¶ 27; Piavskaia Decl. ¶¶ 16, 35; Joffe Decl. 18.  This funding will create further

struggles for Plaintiffs as they will lose their "direct care workers to those LHCSAs that received

the additional funding and can offer better compensation and benefits packages." Pascal Decl. ¶

29; *see also* Piavskaia Decl. ¶ 24; Joffe Decl. ¶ 23.

Second, Plaintiffs' loss of employees will hinder their ability to continue providing

quality HCBS to their clients, as well as taking on new clients. Pascal Decl. ¶¶ 30-31; Piavskaia

Decl. ¶¶ 25-26; Joffe Decl. ¶¶ 24-25.; *See Tom Doherty Assocs., Inc. v. Saban Entm't, Inc.*, 60

F.3d 27, 38 (2d Cir. 1995) (finding the "loss of prospective business" or "prospective goodwill

can constitute irreparable harm").

This is especially so at smaller LHCSAs, such as Plaintiffs, that cater toward specific

culturally diverse populations.  Finding suitable replacements becomes all the more challenging

for Plaintiff Safe Haven's clients that speak Creole, *Pascal Decl. ¶ 37*, for Plaintiff Angel Care's

LatinX and Southeast Asian communities, *Piavskaia Decl. ¶ 29*, or Plaintiff Silver Lining's

Ukrainian, Polish and Hebrew speaking clients, *Joffe Decl. ¶ 31*.  Further, Plaintiffs' inability to

meet its clients' needs will harm their reputations and result in lost clients.  Pascal Decl. ¶ 32;

Piavskaia Decl. ¶ 27; Joffe Decl. ¶ 26; *Regeneron Pharms., Inc. v. U.S. Dep't of Health and*

*Human Sers.*, 510 F.Supp.3d 29, 40-41 (S.D.N.Y. 2020) (finding "irreparable reputation harm" to require a preliminary injunction).  In addition, losing clients not only harms Plaintiffs, but also Medicaid beneficiaries who will have disrupted service and may not find a suitable alternative provider that meets their unique needs.  Pascal Decl. ¶ 31; Piavskaia Decl. ¶ 26; Joffe Decl. ¶ 25; *See Make the Road New York v. Cuccinelli*, 419 F.Supp.3d 647, 665 (S.D.N.Y. 2019) (finding irreparable harm existed for "these individuals, Plaintiffs, and the public at large").

Third, the NYSDOH has announced an upcoming LHCSA Request for Offer ("RFO"), to be implemented on May 1, 2022.[4]  The NYSDOH has not been shy in expressing its desire to eliminate LHCSAs from the New York Medicaid market.[5]  Smaller LHCSAs such as Plaintiffs who fail to receive any funding for the long-term care workforce or VBP readiness will be at a significant disadvantage in competing for contracts in the RFO.  Indeed, the NYSDOH has already announced that it would be "pre-qualifying" a selection of LHCSAs by service area based on VBP arrangements for the RFO, the ***very subject*** of the first directed payment.[6] Piavskaia Decl. ¶ 31.  If the NYSDOH takes a similar approach with LHCSAs as it did in a recent RFO for the Consumer Directed Personal Assistance Program ("CDPAP"), we should expect to see an attempt to eliminate the majority of providers.[7]

---

[4] 2022-23 Executive Budget Briefing and Questions and Answers," (Feb. 2022), at 4, available at https://www.health.ny.gov/health_care/medicaid/redesign/2022/docs/2022-23_exec_budget_presentation.pdf.
[5] *See e.g.*, "Managed Long Term Care Rate Development" (Mar. 22, 2018), at 11, available at https://hca-nys.org/wp-content/uploads/2018/03/DOH-HCA-Presentation-03-22-18.pdf ("Limit the number of LHCSA . . . that Contract with MLTC Plans"); "MTR II Executive Summary of Proposals", (Mar. 19, 2020), at 12, available at https://health.ny.gov/health_care/medicaid/redesign/mrt2/docs/2020-03-19_executive_summary_of_proposals.pdf ("the State would issue a request for proposals to limit the number of licensed home care services agencies (LHCSAs) authorized to participate in the State's Medicaid program.").
[6] 2022-23 Executive Budget Briefing and Questions and Answers," (Feb. 2022), at 13, available at https://www.health.ny.gov/health_care/medicaid/redesign/2022/docs/2022-23_exec_budget_presentation.pdf.
[7] *See* https://www.health.ny.gov/funding/rfo/20039/ (awarding 68 contracts out of approximately 450 fiscal intermediaries in New York State). The lawfulness of the NYSDOH's RFO process for the CDPAP program is currently being challenged.

Fourth, Plaintiffs will suffer irreparable harm from the loss of millions of dollars in funding for HCBS. While normally financial harm alone is insufficient, it becomes irreparable if it constitutes "damages that cannot be rectified by financial compensation." *Borey v. Nat'l Union Fire Ins. Co.*, 934 F.2d 30, 34 (2d Cir. 1991). When a plaintiff cannot recover monetary damages due to sovereign immunity, that loss is irreparable. *See United States v. New York*, 708 F.2d 92, 93 (2d Cir. 1983) (affirming the district court's finding that "[the plaintiff's] injury was irreparable even though [its] losses were only pecuniary because a suit in federal court against [the defendant,] New York[,] to recover the damages sustained by the plaintiff would be barred by the Eleventh Amendment"). Here, Plaintiffs have no monetary remedy against Defendants as the Eleventh Amendment bars recovery against New York State and the Administrative Procedure Act only waives sovereign immunity for "relief other than damages." 5 U.S.C. § 702.

### B. Plaintiffs Are Likely to Succeed on the Merits

To receive a preliminary injunction, the plaintiff must show that it is "likely to succeed on the merits." *Winter*, 555 U.S. 7, 20 (2008). As detailed further in the accompanying Complaint for Declaratory and Injunctive Relief, ¶¶ 56-60, the NYSDOH's first directed payment of $361 million is an unlawful pass-through payment, in violation of the Medicaid Statute, 42 § 1396b(m)(2)(A)(iii), CMS' regulations, 42 C.F.R. § 438.6(c)(1)(i), (c)(2)(ii)(B), § 438.4(b)(7), as well as CMS' sub-regulatory guidance discussing those regulations.

While the NYSDOH's first directed payment suffers from several flaws, the core error stems from the plan's failure to "[d]irect expenditures equally, and using the same terms of performance, for a class of providers proving the service under the contract." 42 C.F.R. § 438.6(c)(2)(B). The purpose of this requirement is two-fold. First, the Medicaid Statute requires that any State prepaid payments to an MCO must be "made on an actuarially sound basis." 42

U.S.C. § 1396b(m)(2)(A)(iii).  This means that rates paid to an MCO are projected to cover all reasonable, appropriate, and attainable costs that are required under the terms of the contract between the State and the MCO for the time period and population covered. 42 C.F.R. § 438.4. This Medicaid Statute requirement is fundamental to the concept of managed care, *i.e.*, States pay a fair price per-member-per-month to MCOs and then MCOs are responsible for managing the care, quality, costs, and efficiencies of their contracted providers and accepting risk from the arrangement.  When a state steps in and directs supplemental payments to providers, that erodes actuarial soundness, unless specific criteria are met.  *See* 42 C.F.R. § 438.6(c).

One directed payment arrangement that is permitted is a value-based purchasing model that recognizes value or outcomes over volume of services. 42 C.F.R. § 438.6(c)(1)(i).  The NYSDOH's first directed payment, which is based *entirely* on volume of services, is certainly not such an arrangement.  *See* Complaint for Declaratory and Injunctive Relief, at ¶ 60.  Another permissible approach is to "[p]rovide a uniform dollar or percentage increase for network providers that provide a particular service under the contract."  42 C.F.R. § 438.6(c)(1)(ii).  The NYSDOH's first directed payment plan likewise fails this test, as Plaintiffs all provide personal care services under contracts with Medicaid MLTCs/MAPs, the type of service that formed the basis for the NYSDOH's calculated award.[8]  Hardly "uniform," Plaintiffs will receive nothing. And since NYSDOH cannot meet 42 C.F.R. § 438.6(c)(1)(i)-(iii), that ends the inquiry and NYSDOH's plan is unlawful.  42 C.F.R. § 438.4(b)(7); 42 C.F.R. § 438.6(c)(2)(i).

Moreover, even assuming *arguendo* that the first directed payment met 42 C.F.R. § 438.6(c)(1)(i)-(iii), the plan clearly fails to "[d]irect expenditures equally, and using the same

---

[8] "Long Term Care Workforce and Value-Based Payment Readiness Implementation Provider Webinar," (Jan. 2022), at 17, available at  https://nyshcp.org/common/Uploaded%20files/Public%20Policy/DSRIP-VBP-MRT/LTC%20Workforce%20VBP%20Slides.pdf.

terms of performance, for a class of providers providing the service under the contract," an *additional* requirement for lawful approval of a Section 438.6(c) Preprint Application. A "class of providers" is certainly not one-third of LHCSAs. Nor is it a portion of the providers that perform Medicaid personal care services.

While the NYSDOH has not yet publicly posted CMS' approval of its Section 438.6(c) Preprint Application, presumably CMS will take the position that the NYSDOH's "class of providers" is not unlawful. If so, CMS' view must not receive any deference under *Auer v. Robbins*, 519 U.S. 452, 462 (1997) (a court will defer to an agency's interpretation of its own regulation so long as it is not "plainly erroneous or inconsistent with the regulation"). This is because "*Auer* deference, like *Chevron* deference, 'is warranted only when the language of the regulation is ambiguous.'" *Linares Huarcaya v. Mukasey*, 550 F.3d 224, 229 (2d Cir. 2008). Here, there is no ambiguity to the plain language of 42 C.F.R. § 438.6(c)(2)(ii)(B), nor is there ambiguity regarding a "uniform dollar or percentage increase for network providers that provide a particular service under the contract." *Id*. § 438.6(c)(1)(iii)(C).

Moreover, as discussed further in the Complaint for Declaratory and Injunctive Relief, see ¶¶ 43-47, CMS has issued sub-regulatory guidance after sub-regulatory guidance interpreting "class of providers" in a manner consistent with Plaintiffs' position and with the plain language of the regulation. *See* CMCS Informational Bulletin, "Medicaid Managed Care Options in Responding to COVID-19," (May 14, 2020), available at https://www.medicaid.gov/federal-policy-guidance/downloads/cib051420.pdf ("[h]istorically, CMS has deferred to states in defining the provider class for purposes of state directed payment arrangements, ***as long as the provider class is reasonable and identifiable, such as the provider class being defined in the state's Medicaid State Plan***." *Id*. at 6 (emphasis added)); ("[e]xamples of state directed

payments for a target class or classes of providers providing services under the contract could include ***dental, behavioral health, home health and personal care, pediatric, federally-qualified health centers, and safety-net hospitals***" and "payments must be directed equally, using the same terms of performance across a class of providers.") (emphasis added); State Medicaid Director Letter #21-001, "RE: Additional Guidance on State Directed Payments in Medicaid Managed Care," (Jan. 8, 2021), available at https://www.medicaid.gov/Federal-Policy-Guidance/Downloads/smd21001.pdf ("State directed payments are required under 42 C.F.R. § 438.6(c)(2)(ii)(B) to direct expenditures equally, using the same terms of performance, for a ***class of providers*** providing the service under the contract." Id. at 6 (emphasis in original); (In addition, the Preprint Application must be specific to the provider class, "[f]or example, if the state defined the provider class for a state directed payment as primary care physicians, the analysis of the reimbursement levels would need to be specific to primary care physicians; it should not include all physicians (primary care and specialty physicians)." *Id*. at 7.

When an agency has already issued sub-regulatory guidance interpreting a regulation, but takes a different position for litigation, the agency will not receive *Auer* deference. *See Robinson Knife Mfg. Co. v. Comm'r of Internal Revenue*, 600 F.3d 121, 134 n. 11 (2d Cir. 2010) (Commissioner's litigation position was contrary to previous sub-regulatory guidance by the agency; thus, it did "not reflect the agency's fair and considered judgment on the matter in question") (internal citations omitted).  CMS has already spoken, multiple times, concerning its interpretation of a "class of providers."  And each time it has spoken, it has echoed Plaintiffs' position in this litigation.  Thus, any efforts by CMS to propose a new interpretation at this juncture must be rejected.

As a result of the foregoing, and because the NYSDOH's first directed payment plan fails on multiple fronts, both under statute and regulation, Plaintiffs' likelihood of success on the merits is strong.

### C.  The Balance of Equities and Public Interest Favor Preliminary Relief

When the defendants are the government, as is the case here, the "third and fourth factors, harm to the opposing party and the public interest, merge." *Nken v. Holder*, 556 U.S. 418, 420 (2009).  In this case, the public interest strongly favors preliminary relief as Medicaid beneficiaries have an interest—and a critical health need—for continued HCBS services, and of sufficient quality.  In particular, culturally diverse populations served by Plaintiffs have a strong interest in the continued operation of Plaintiffs, as well as Plaintiffs' ability to retain home care workers to whom they have become accustomed.  It is hard to imagine a more important setting for cultural acuity and shared language than an elderly, disabled, or chronically ill Medicaid beneficiary inviting a home care worker into his or her home to perform personal care services.

The public also has a strong interest in ensuring that taxpayer funding, including COVID-19 emergency stimulus funding such as ARPA Section 9817, and matching New York State Medicaid funds, are only distributed in a manner that is consistent with federal law and regulation.  *United States v. Suarez*, 880 F.2d 626, 630 (2d Cir. 1989)("[T]here is an obvious legitimate public interest in how taxpayers' money is being spent, particularly when the amount is large.").

## <u>CONCLUSION</u>

For the foregoing reasons, Plaintiffs respectfully request this Court to grant their Motion for a temporary restraining order, preliminary injunction, and expedited briefing schedule.

Dated: March 18, 2022                          Respectfully submitted,

                                               Potomac Law Group, PLLC

                                               /s/ Derek Adams
                                               Derek Adams (pro hac vice forthcoming)
                                               /s/ Neil H. Koslowe
                                               Neil H. Koslowe (N.Y. Bar No. 2309854)
                                               /s/ Susan B. Hendrix
                                               Susan B. Hendrix (pro hac vice
                                               forthcoming)
                                               Potomac Law Group, PLLC
                                               1177 Avenue of the Americas, 5th Floor
                                               New York, NY 10036
                                               Telephone: (646) 519-7477
                                               1300 Pennsylvania Avenue, N.W., Suite 700
                                               Washington, DC 20004
                                               Telephone: (202) 558-5557
                                               Fax: (202) 318-7707
                                               E-mail: dadams@potomaclaw.com
                                                       nkoslowe@potomaclaw.com
                                                       shendrix@potomaclaw.com

                                               *Attorneys for Plaintiffs*