UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK
------------------------------------------------------------------------X
                                    :

SAFE HAVEN HOME CARE, INC. *et al.*,     :
                                      :

                Plaintiffs,     :

                                      :      22 Civ. 2267 (JPC)
        -v-                   :
                                        :      <u>OPINION AND ORDER</u>
UNITED STATES DEPARTMENT OF HEALTH AND :
HUMAN SERVICES *et al.*,             :

                                     :

                Defendants.     :

------------------------------------------------------------------------X

JOHN P. CRONAN, United States District Judge:

      Plaintiffs, a group of licensed home care services agencies ("LHCSAs"), challenge a Medicaid payment scheme that was adopted and implemented by New York State and pre-approved by the federal government in the spring of 2022 (the "2022 Disbursement").  First, Plaintiffs claim that by paying out the 2022 Disbursement, a group of New York State entities (the "State Defendants") violated the Medicaid Act, 42 U.S.C. § 1396b(m)(2)(A)(iii), and various provisions of its implementing regulations, 42 C.F.R. § 438.4-.6.  Dkt. 55 ("Am. Compl.") ¶¶ 76, 79, 89-91, 96-98.  Second, Plaintiffs claim that by pre-approving the 2022 Disbursement, a group of federal entities (the "Federal Defendants") violated the Administrative Procedure Act ("APA"), 5 U.S.C. § 706(2), the Medicaid Act, and various provisions of its implementing regulations.  Am. Compl. ¶¶ 74-75, 81-84, 87.  Against the State Defendants, who comprise the New York State Department of Health ("DOH"), James V. McDonald in his official capacity as Commissioner of Health, and Amir Bassiri in his official capacity as State Medicaid Director,[1] Plaintiffs seek

---

[1] Pursuant to Federal Rule of Civil Procedure 25(d), McDonald was automatically substituted for Mary T. Bassett, his predecessor, upon his appointment as Acting Commissioner of Health on January 1, 2023.  *See* New York State Department of Health, *James V. McDonald*

equitable relief enjoining the disbursement of funds pursuant to the 2022 Disbursement or pursuant to any other scheme directing payment towards the same class of LHCSAs.  *Id.* at 22 (Requested Relief B).  Against the Federal Defendants, who comprise the United States Department of Health and Human Services ("HHS"), Xavier Becerra in his official capacity as HHS Secretary, the United States Centers for Medicare and Medicaid Services ("CMS"), and Chiquita Brooks-Lasure in her official capacity as CMS Administrator, Plaintiffs seek an order and judgment that the CMS's March 2022 pre-approval of the 2022 Disbursement was in excess of statutory authority, arbitrary and capricious, an abuse of discretion, and otherwise not in accordance with law, and therefore was in violation of the APA.  *Id.* (Requested Relief A).

Now before the Court are the State Defendants' motion to dismiss the Amended Complaint, Dkt. 61, and the Federal Defendants' motion to dismiss the Amended Complaint or, in the alternative, for summary judgment, Dkt. 63.  Just as Plaintiffs seek different kinds of relief from each group of Defendants, based on different sorts of claims, so too does each group of Defendants advance different arguments for why Plaintiffs are not entitled to the relief sought.  The State Defendants argue that the claims brought against them must be dismissed because neither the statutory provisions nor the regulations they are alleged to have violated may be enforced through a private right of action, Dkt. 62 ("State Defts. Br.") at 6-12, because the Court must defer to CMS's decision to approve the payment scheme under *Chevron, U.S.A., Inc. v. Natural Resources*

---

*M.D., M.P.H.* (June 2023), https://www.health.ny.gov/commissioner/bio/ (last accessed July 8, 2023).  Similarly, Bassiri was automatically substituted for his predecessor, Brett R. Friedman, when Bassiri took over the position of State Medicaid Director, which occurred at some point in spring 2022.  *See* Letter from Brett R. Friedman, State Medicaid Director, to Mary T. Bassett, Commissioner of Health (Apr. 8, 2022), http://sachspolicy.com/wp-content/uploads/2022/04/friedman-resignation-letter.pdf (last accessed July 8, 2023) (describing plans to transition responsibilities as State Medicaid Director to Bassiri between April 8, 2022 and Friedman's departure effective May 27, 2022).  Therefore, the Clerk of Court is respectfully directed to substitute James V. McDonald for Mary T. Bassett and to substitute Amir Bassiri for Brett R. Friedman in the caption of this case.

*Defense Council, Inc.*, 467 U.S. 837 (1984), State Defts. Br. at 12-13, and because DOH's disbursement of funds under the payment scheme renders Plaintiffs' claims against the State Defendants moot, *id.* at 13-14.  The Federal Defendants argue first that the claims brought against them must be dismissed because Plaintiffs lack prudential standing under the APA to enforce the statutory provisions and regulations that the Federal Defendants allegedly violated, Dkt. 65 ("Fed. Defts. Br.") at 10-14, and in the alternative that Plaintiffs' claims fail on the merits because CMS's pre-approval of New York's Medicaid payment scheme did not violate federal law, *id.* at 14-20.

Because the procedural postures of these two motions differ, the factual basis upon which the Court must decide each differs as well.  While the State Defendants' motion to dismiss for failure to state a claim may be decided based on the pleadings, the Federal Defendants' motion, which argues in part that CMS's pre-approval of the 2022 Disbursement complied with federal law, requires consideration of a more extensive factual record.  In order to evaluate the legality of an action undertaken by a federal administrative agency, a court must review the administrative record documenting the challenged action.  Consequently, in support of their motion, the Federal Defendants have filed the certified administrative record from CMS's March 2022 pre-approval of New York's payment scheme.  Dkts. 64-2 to 64-14.  Judicial review of agency action is presumptively limited to the administrative record.  Plaintiffs, however, argue that various exceptions to that presumption apply in this case, and consequently they have moved for the admission of two types of additional evidence—expert testimony from two individuals with experience in the health care field, including an actuary, and two annual rate certifications submitted by DOH to CMS that incorporate the disputed payment scheme.  Dkt. 78.  The State and Federal Defendants each oppose the admission of this additional evidence.  Dkts. 80, 81.

Because both the contested legal issues and certain relevant facts differ between the State Defendants' and Federal Defendants' motions, the Court will bifurcate this Opinion and Order into

3

separate sections addressed to each group of Defendants.  And because Plaintiffs' motion for the admission of evidence beyond the administrative record pertains only to the Federal Defendants' motion, the Court will address Plaintiffs' motion in the course of resolving the Federal Defendants' motion.   Each part reaches the same conclusion—Plaintiffs' claims fail.  Plaintiffs' Amended Complaint fails to state a claim against the State Defendants because no cause of action grants Plaintiffs the right to the relief they seek.  The State Defendants' motion to dismiss is therefore granted.  Plaintiffs' claims against the Federal Defendants fail on the merits because CMS's pre-approval of the 2022 Disbursement did not violate the APA, the Medicaid Act, or its implementing regulations.   The Federal Defendants' motion for summary judgment is therefore granted. Furthermore, because the evidence Plaintiffs seek to admit concerns the actuarial soundness of the 2022 Disbursement—a question that was not properly before CMS during the pre-approval process—Plaintiffs have not overcome the presumption that the Court should consider only the administrative record in reviewing the legality of agency action.  Their motion to admit that evidence is therefore denied.

## I.  The State Defendants' Motion to Dismiss

### A.  Background[2]

#### 1.  Statutory Background

In the United States, subsidized health care for low-income individuals is provided by Medicaid, a joint initiative between the federal government and the states.  Am. Compl. ¶ 36. Medicaid is operated by the governments of the several states, but it is partially funded from the

---

[2] The following facts, which are assumed true for purposes of the portion of this Opinion and Order resolving the State Defendants' motion to dismiss, are drawn from the Amended Complaint or from relevant statutes and regulations.  *See Interpharm, Inc. v. Wells Fargo Bank, Nat'l Ass'n*, 655 F.3d 136, 141 (2d Cir. 2011) (explaining that on a motion to dismiss pursuant to Rule 12(b)(6), the court must "assum[e] all facts alleged within the four corners of the complaint to be true, and draw[] all reasonable inferences in plaintiff's favor").

federal treasury and is regulated by federal law.  *Id.*  New York, like many other states, operates its Medicaid program through managed care organizations ("MCOs").  *Id.* ¶ 38.  MCOs act as middlemen standing between the state, which pays for medical services provided to low-income individuals, and the health care providers that care for patients.  *Id.*  To implement this arrangement, the state and MCOs enter into contracts under which each MCO manages the care of Medicaid-eligible individuals enrolled as its members.  *Id.*  In exchange, each MCO is paid a monthly amount for each member enrolled.  *Id.*  The MCOs then enter into separate contracts with health care providers, under which each MCO pays for the medical services that its members receive.  *Id.*  LHCSAs are one type of provider that MCOs pay to provide such services.  *Id.* ¶ 49.  Lastly, the federal government funds such programs by partially reimbursing the state for authorized expenditures, including expenditures made to MCOs.  42 U.S.C. § 1396b(m)(2)(A).

Under the terms of these contracts, financial risk is transferred from the states to the MCOs, which receive a fixed monthly payment per member but must pay the actual cost of the medical services their members in fact consume at prices agreed to by MCOs and service providers.  Am. Compl. ¶ 45 (quoting Final Rule Concerning Medicaid and CHIP Programs and Managed Care, 81 Fed. Reg. 27,498, 27,588 (May 6, 2016) (codified at 42 C.F.R. Parts 431, 433, 438, 440, 457, and 495)).  The monthly payment each MCO receives, then, should reflect a projection that covers the expected costs of providing the medical services covered by its contract with the state, given the population it enrolls as members.  *Id.* ¶ 41.  This concept is known as "actuarial soundness." *Id.*; *see also* 42 C.F.R. § 438.4(a) (defining "actuarially sound capitation rates").  Furthermore, as CMS has explained, because MCOs bear the financial risk associated with the provision of medical services, they must also possess the discretion to manage that risk by determining which health care providers to contract with and at what prices:  "Inherent in the transfer of risk to the MCO is the concept that the MCO has both the ability and the responsibility to utilize the funding under

that contract to manage the contractual requirements for the delivery of services."  Final Rule
Concerning Medicaid and CHIP Programs and Managed Care, 81 Fed. Reg. at 27,588.  For that
reason, federal law restricts states' ability to use "pass-through payments," which are certain
contractual provisions between states and MCOs that require the MCO to make specified payments
to particular health care providers.  Am. Compl. ¶ 42; *see also* 42 C.F.R. § 438.6(a) (defining a
"pass-through payment").  Contractual provisions between states and MCOs may direct the MCO
to make particular payments to providers, however, if the requirements set forth at 42 C.F.R.
§ 438.6(c) are satisfied and if CMS pre-approves the directed payments through a "Section
438.6(c) Preprint Application."  Am. Comp. ¶ 43.

### 2.  New York's March 2022 Spending Plan for Enhanced FMAP Funding

In the wake of the COVID-19 pandemic, Congress enacted and President Biden signed the
American Rescue Plan Act of 2021 ("ARPA"), Pub. L. No. 117-2, 135 Stat. 4.  Am. Compl. ¶ 31.
Among other provisions, section 9817 of ARPA increased the Federal Medical Assistance
Percentage ("FMAP") with respect to expenditures for Home and Community-Based Services
("HCBS").  *Id.* ¶ 32.  As a result, the states received additional federal funds that could be spent
on those services, provided that the expenditures complied with requirements set forth by ARPA
and were approved by CMS.  *Id.* ¶¶ 33-35.  In addition, such expenditures were bound by any
Medicaid requirements or regulations already imposed through existing law.  *Id.* ¶ 35.

On July 8, 2021, DOH submitted its initial plan for spending the ARPA section 9817 funds.
*Id.* ¶ 52.  That plan devoted a substantial amount of funding towards improving the workforce
dedicated to providing long-term care.  *Id.* ¶¶ 52-53.  The plan further specified that eligible
provider classes would include LHCSAs, in addition to other providers and supporting entities in
the health care sector.  *Id.* ¶ 54.  On August 25, 2021, CMS partially approved DOH's initial plan.
*Id.* ¶ 55.  Subsequently, however, New York amended its plan to redefine the class of providers

eligible for the additional funding.  *Id.* ¶ 58.  In particular, rather than making all LHCSAs eligible for funding, the revised plan provided funding within each region in New York State to only those LHCSAs with revenues in the top one-third out of all LHCSAs, *i.e.*, the 2022 Disbursement.  *Id.* ¶ 59.  On March 4, 2022, CMS approved New York's section 438.6(c) preprint application, thereby authorizing it to carry out the 2022 Disbursement.  *Id.* ¶ 70.

### 3.  Procedural History

Shortly thereafter, on March 18, 2022, Plaintiffs filed the Complaint initiating this case, Dkt. 1, as well as a proposed order for Defendants to show cause why the Court should not issue a temporary restraining order or preliminary injunction enjoining the 2022 Distribution, Dkt. 12.  On March 30, 2022, following expedited briefing, the Court held a hearing at which it heard testimony from witnesses called by each party, and then denied Plaintiffs preliminary relief.  Dkt. 45.  Plaintiffs subsequently brought an interlocutory appeal of that denial.  Dkt. 47.  After the Second Circuit denied their motion for an injunction pending appeal, *see* Dkt. 50, the parties jointly stipulated to the withdrawal of the interlocutory appeal, *see* Dkt. 52.  Plaintiffs then amended the Complaint on June 1, 2022.  Dkt. 55.  On September 2, 2022, the State Defendants moved to dismiss.  Dkt. 61.  Plaintiffs opposed that motion on October 14, 2022, Dkt. 71 ("Pls. Opp."), and the State Defendants replied on November 14, 2022, Dkt. 76 ("State Defts. Reply").  On May 3, 2023, the State Defendants submitted a letter to the Court arguing that the current status of the funds at issue in this litigation strengthens their argument that the claims brought against them are now moot, Dkt. 83 ("5/3/23 State Defts. Ltr."), and on May 5, 2023, Plaintiffs submitted a letter opposing those arguments, Dkt. 84 ("5/5/23 Pls. Ltr.").

## B.  Legal Standards

The State Defendants have moved to dismiss both for lack of subject matter jurisdiction on mootness grounds, pursuant to Federal Rule of Civil Procedure 12(b)(1), and for failure to state a

claim, pursuant to Rule 12(b)(6).  To survive a motion to dismiss for failure to state a claim, "a complaint must contain sufficient factual matter, accepted as true, to 'state a claim to relief that is plausible on its face.'"  *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009) (quoting *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 570 (2007)).  A claim is plausible "when the plaintiff pleads factual content that allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged." *Id.*  A complaint's "[f]actual allegations must be enough to raise a right to relief above the speculative level." *Twombly*, 550 U.S. at 555.  Although the Court must "accept[] as true the factual allegations in the complaint and draw[] all inferences in the plaintiff's favor," *Biro v. Conde Nast*, 807 F.3d 541, 544 (2d Cir. 2015), it need not "accept as true legal conclusions couched as factual allegations," *LaFaro v. N.Y.  Cardiothoracic Grp., PLLC*, 570 F.3d 471, 475-76 (2d Cir. 2009).  By contrast, when subject matter jurisdiction is at issue, "a defendant is permitted to make a fact-based Rule 12(b)(1) motion, proffering evidence beyond the" complaint. *Carter v. HealthPort Techs., LLC*, 822 F.3d 47, 56-57 (2d Cir. 2016).

## C.  Discussion

The State Defendants advance three arguments in favor of dismissing the claims pled against them in the Amended Complaint.  As a threshold jurisdictional matter, they argue that this case became moot once New York caried out the 2022 Disbursement.  State Defts. Br. at 13-14. They further argue that no private cause of action authorizes a court to grant the relief Plaintiffs seek based on the violations of federal statutes and regulations that they allege. *Id.* at 6-12.  Lastly, the State Defendants argue that the Court should defer to CMS's approval of the 2022 Disbursement. *Id.* at 12-13.  Because a finding that this case has become moot would deprive the Court of subject matter jurisdiction, *see, e.g.*, *Doyle v. Midland Credit Mgmt., Inc.*, 722 F.3d 78, 80 (2d Cir. 2013), the Court cannot proceed to the State Defendants' remaining arguments unless it first concludes that Plaintiffs' claims against the State Defendants are not moot.  Having reached

that conclusion, the Court will then examine whether any cause of action exists under which Plaintiffs might seek relief based on the facts alleged in the Amended Complaint.  Because no such cause of action exists, the State Defendants' motion to dismiss is granted.

### 1.  Mootness

"A case becomes moot only when it is impossible for a court to grant any effectual relief whatever to the prevailing party." *Knox v. Serv. Emps. Int'l Union, Local 1000*, 567 U.S. 298, 307 (2012).  Plaintiffs claim that the 2022 Disbursement violated federal statutes and federal regulations, Am. Compl. ¶¶ 76, 79, 89, 96, and consequently ask the Court to enjoin the State Defendants from making the 2022 Disbursement or further distribution under the same "class of providers," *id.* at 22 (Requested Relief B).  The 2022 Disbursement was already paid out, however, on or around March 31, 2022.  Am. Compl. ¶ 9.  Thus, for the Court now to enjoin the State Defendants from making the 2022 Disbursement would be wholly ineffectual, like closing the barn door after the horse has bolted.  And because such an injunction would be wholly ineffective, the State Defendants argue, the Court is no longer able to "grant any effectual relief" to Plaintiffs even were they to prevail, and thus Plaintiffs' claims against the State Defendants have become moot.

In response, Plaintiffs do not appear to dispute that the Court cannot effectively enjoin the State Defendants from disbursing a payment that has already been disbursed.  *See* Pls. Opp. at 17-21.  Nonetheless, Plaintiffs argue that for two distinct reasons they might still benefit from the injunctive relief that they ask the Court to grant.  *Id.*  First, Plaintiffs argue that the funds the State Defendants have already disbursed to MCOs in the 2022 Disbursement are subject to recoupment under certain circumstances, and that an injunction could effectually prevent the State Defendants from re-distributing any recouped funds in accordance with the allegedly unlawful scheme that governed the 2022 Disbursement.  Pls. Opp. at 19-20; 5/5/23 Pls. Ltr. at 1.  Second, Plaintiffs argue that there is a risk of the State Defendants disbursing additional funds pursuant to schemes similar

to the allegedly unlawful one that governed the 2022 Disbursement, and that an injunction could effectually prevent such future disbursements.  5/5/23 Pls. Ltr. at 1-2.  Such relief might not successfully remedy the full injury Plaintiffs suffered from the allegedly unlawful payment of the 2022 Disbursement.  But a case does not become moot simply because the relief available cannot make a plaintiff whole; rather, any "concrete interest, however small, in the outcome of the litigation" suffices for a dispute to remain live.  *Ellis v. Bhd. of Ry., Airline & S.S. Clerks*, 466 U.S. 435, 442 (1984).  And by providing them with "a legally cognizable interest in the outcome" of the case, *Powell v. McCormack*, 395 U.S. 486, 496 (1969), Plaintiffs argue, these benefits would make the injunction they seek effectual and would therefore prevent this case from being moot.

"The test for mootness . . . is a stringent one" when a defendant claims that a court cannot grant effectual relief because the defendant's allegedly unlawful conduct has ceased.  *United States v. Concentrated Phosphate Export Ass'n*, 393 U.S. 199, 203 (1968).  In particular, "[m]ere voluntary cessation of allegedly illegal conduct does not moot a case," since defendants would then be "free to return to [their] old ways."  *Id.* (internal quotation marks omitted).  Instead, subsequent events must "ma[k]e it absolutely clear that the allegedly wrongful behavior [cannot] reasonably be expected to recur."  *Id.*  When a plaintiff seeks an injunction against a government entity, this "heavy burden of persuasion," *id.*, may be satisfied if, by law or regulation, that entity is forbidden from engaging in the future in the conduct the plaintiff seeks to enjoin.  *See, e.g.*, *Lamar Advert. of Penn, LLC v. Town of Orchard Park*, 356 F.3d 365, 375-79 (2d Cir. 2004) (holding the case moot when the town repealed the ordinance alleged to be unconstitutional); *Harrison & Burrowes Bridge Constructors, Inc. v. Cuomo*, 981 F.2d 50, 58-61 (2d Cir. 1992) (holding the case moot when state emergency regulation suspended enforcement of the state program alleged to be unconstitutional).

The State Defendants have not met their "heavy burden." *Concentrated Phosphate Export Ass'n*, 393 U.S. at 203.  As to the possibility that future disbursements will be made on the same allegedly unlawful basis that governed the 2022 Disbursement, the State Defendants merely assert in a letter from counsel that "DOH additionally reports that it has determined not to repeat the methodology" of the 2022 Disbursement and instead "has spent funds for other programmatic priorities."  5/3/23 State Defts. Ltr. at 2.  This determination to avoid future disbursements governed by the same principles as the 2022 Disbursement is not reflected in any identified statute, regulation, or other document with the force of law, nor even in any statement of policy or sworn affidavit from a decision-maker; indeed, no citation whatsoever supports what is merely an unsworn assertion from counsel.  *See generally id.*  And as to the possibility that recouped funds might be spent in accordance with the same principles that governed the 2022 Disbursement, that letter merely reports that the funds recouped so far were not spent in that manner, but does not otherwise provide any information as to how the State Defendants intend to spend any funds that may be recouped in the future.  *Id* at 1.  Taken together, these representations do not "ma[k]e it absolutely clear that the allegedly wrongful behavior could not reasonably be expected to recur." *Concentrated Phosphate Export Ass'n*, 393 U.S. at 203.  Rather, because it appears at least conceivable that the State Defendants might in the future spend funds according to the allegedly unlawful methodology that governed the 2022 Disbursement, the State Defendants have not shown that it would be "*impossible* for a court to grant any effectual relief whatever to the prevailing party." *Knox*, 567 U.S. at 307 (emphasis added).  Therefore, this case has not become moot.

## 2. *Ex Parte Young*

In their opening brief, the State Defendants argue that no private right of action exists through which Plaintiffs might enforce the provisions of the Medicaid Act and of its implementing regulations that the State Defendants allegedly violated.  State Defts. Br. at 6-12.  In their

opposition brief, Plaintiffs do not dispute that no federal statute creates a private right of action under which this case might be brought.  Pls. Opp. at 15.  Nonetheless, as Plaintiffs correctly note, the Supreme Court has long recognized, most notably in its seminal decision in *Ex parte Young*, 209 U.S. 123 (1908), that "federal courts may in some circumstances grant injunctive relief against state officials who are violating, or planning to violate, federal law."  *Armstrong v. Exceptional Child Ctr., Inc.*, 575 U.S. 320, 326 (2015).  The power to grant such relief does not derive from any statutory right of action; rather, as "a judge-made remedy," it was "the creation of courts of equity, . . . reflect[ing] a long history of judicial review of illegal executive action."  *Id.* at 327.  Thus, Plaintiffs claim, they bring this action not under any statutory right of action but rather pursuant to the Court's equitable authority to enjoin state officials from violating federal law.[3]

---

[3] Scholars have long noted that "the lack of an express or statutory right of action" constitutes an "apparent problem with the *Ex parte Young* action."  James E. Pfander & Jacob P. Wentzel, *The Common Law Origins of* Ex Parte Young, 72 Stan. L. Rev. 1269, 1287 (2020); *see also* David L. Shapiro, Ex Parte Young *and the Uses of History*, 67 N.Y.U. Ann. Surv. Am. L. 69, 74-75 (2011) ("Since no federal statute is cited as the source of either the right asserted or the remedy sought, what is the source of that right and that remedy?" (footnote omitted)).  Some have proposed that *Ex parte Young* recognized a cause of action implied by the Fourteenth Amendment, *see, e.g.*, Richard H. Fallon, Jr. *et al.*, Hart and Wechsler's The Federal Courts and The Federal System 927 (7th ed. 2015), or the Supremacy Clause, *see, e.g.*, *Burgio & Campofelice, Inc. v. N.Y. State Dep't of Labor*, 107 F.3d 1000, 1006 (2d Cir. 1997) ("[W]e agree with those commentators who have concluded that 'the best explanation of Ex parte Young and its progeny is that the Supremacy Clause creates an implied right of action for injunctive relief against state officers who are threatening to violate the federal Constitution or laws.'" (brackets omitted) (quoting Charles Alan Wright *et al.*, Federal Practice and Procedure: Jurisdiction § 3566 (2d ed. 1984))); Stephen I. Vladeck, Douglas *and the Fate of* Ex Parte Young, 122 Yale L.J. Online 13, 14 (2012).  Others have argued that it relied on the power of a court of equity to enjoin a threatened action at law based on the existence of a valid defense.  *See, e.g.*, *Mich. Corr. Org. v. Mich. Dep't of Corr.*, 774 F.3d 895, 906 (6th Cir. 2014); John Harrison, *Ex Parte* Young, 60 Stan. L. Rev. 989, 996-1001 (2008); *but see* Pfander & Wentzel, *supra*, at 1338-43 (arguing that, for multiple reasons, *Ex parte Young* would not fall within the traditional equitable power to grant anti-suit injunctions).  While *Armstrong* hardly puts all such disputes to rest, it does clarify that federal courts' power to grant equitable relief against government officials does not rest on statutory authorization but rather "is the creation of courts of equity."  575 U.S. at 327.  Furthermore, nothing in *Armstrong* limits that power to circumstances in which the particular injunctive relief sought is an anti-suit injunction.

But although *Ex parte Young* and its progeny do recognize federal courts' authority to enjoin ongoing violations of federal law, they also recognize limits on when that authority may be exercised. Federal courts may grant injunctive relief against state officials who "are violating, or planning to violate, federal law." *Id.* at 326. As the Supreme Court has explained, "prospective relief of the sort awarded in *Ex parte Young*" is "designed to end a continuing violation of federal law" in order to "vindicate the federal interest in securing the supremacy of that law." *Green v. Mansour*, 474 U.S. 64, 68 (1985). Consequently, a court may grant equitable relief pursuant to *Ex parte Young* only after conducting "a straightforward inquiry into whether a complaint alleges an ongoing violation of federal law and seeks relief properly characterized as prospective." *Idaho v. Coeur d'Alene Tribe of Idaho*, 521 U.S. 261, 296 (1997) (O'Connor, J., concurring); *see also Verizon Md., Inc. v. Public Serv. Comm'n of Md.*, 535 U.S. 635, 645 (2002) (quoting *Coeur d'Alene*). The Court may grant Plaintiffs the injunctive relief they seek pursuant to *Ex parte Young* only if that inquiry is satisfied.[4]

---

[4] In their briefing, the State Defendants raise a potential alternative basis for holding that *Ex parte Young* does not authorize this suit. *Armstrong* held that even if *Ex parte Young* would otherwise authorize federal courts to enjoin state officials from violating federal law, certain statutes, including the provision of the Medicaid Act at issue in *Armstrong*, "implicitly preclude[] private enforcement," including private enforcement under *Ex parte Young*. 575 U.S. at 328. The State Defendants argue that the provisions of federal law they allegedly violated likewise implicitly preclude private enforcement. State Defs. Br. at 8-9. Whether *Armstrong* may properly be extended to the facts of this case, however, is unclear. *Armstrong* found that Congress intended to preclude private enforcement of section 30(A) of the Medicaid Act, 42 U.S.C. § 1396a(a)(30)(A), for two reasons: first, because Congress had provided an alternative remedy for violations of that provision—namely, the withholding of federal reimbursement under 42 U.S.C. § 1396c—and second, because the text of section 30(A) is "judicially unadministrable." *Armstrong*, 575 U.S. at 328-29. The State Defendants have presented no analysis showing that either of these two considerations apply here, however. *See* State Defs. Br. at 8-9; State Defs. Reply at 3-4. Furthermore, while *Armstrong* held that Congress can implicitly foreclose private enforcement of federal statutes, including in courts of equity, it did not address whether *agencies* can similarly foreclose private enforcement in courts of equity of the regulations they promulgate, such as the regulations that the State Defendants are alleged to have violated. Am. Compl. ¶¶ 76, 96.

The Amended Complaint plainly does not satisfy that inquiry, and therefore fails to allege facts that, if proved, would authorize the Court to grant injunctive relief pursuant to *Ex parte Young*.  Because *Ex parte Young* recognizes a federal court's authority to grant injunctive relief only in order to "vindicate the federal interest in assuring the supremacy" of federal law by "end[ing] a continuing violation" of that law, *Green*, 474 U.S. at 68, a complaint must allege that the defendant's violation of law is continuing or ongoing.  *E.g.*, *Verizon Md., Inc.*, 535 U.S. at 645.  This the Amended Complaint fails to do.  To be sure, the Amended Complaint contains detailed allegations setting forth the background, development, approval, and payment of the 2022 Disbursement, *see* Am. Compl. ¶¶ 31-72, and it further alleges that by making that disbursement the State Defendants violated 42 U.S.C. § 1396b and 42 C.F.R. § 438.6, *see* Am. Compl. ¶¶ 10, 62, 71-72, 76, 79, 89, 96.  But the 2022 Disbursement was an event that took place *in 2022*—that is, in the past.  Am. Compl. ¶ 9.  Thus, allegations as to the unlawfulness of the 2022 Disbursement do not suffice to state a claim for equitable relief pursuant to *Ex parte Young*, since such allegations establish only a past violation of federal law rather than the requisite ongoing violation of federal law.  *See, e.g.*, *Vega v. Semple*, 963 F.3d 259, 282-83 (2d Cir. 2020) (holding that no "remedy may permissibly be fashioned under *Ex parte Young*" with respect to "those putative class members who are not currently incarcerated, as there is no ongoing violation of federal law with regard to class members who are not in custody"); *Farricieli v. Holbrook*, 215 F.3d 241, 246 (2d Cir. 2000) (per curiam) (explaining that *Ex parte Young* does not authorize relief when "the object of [the plaintiff's] suit is not to compel the Commissioner to cease ongoing violations of federal law . . . but to require the State of Connecticut to clean up the site to compensate for the Commissioner's alleged failure to monitor the site"); *McKeown v. N.Y. State Comm'n on Judicial Conduct*, 377 F. App'x 121, 123 (2d Cir. 2010) (affirming dismissal of a complaint alleging a past "dismissal of

the Appellant's attorney grievance complaints" on the grounds that such allegations establish "no ongoing violation of federal law").

The alleged unlawfulness of the 2022 Disbursement alone therefore cannot ground a claim for relief pursuant to *Ex parte Young*. Nonetheless, starting with *Ex parte Young* itself, the Supreme Court has granted equitable relief not only in cases of actual ongoing violations of federal law but also in cases of ongoing, imminent threats to violate federal law. *Ex parte Young*, 209 U.S. at 156 ("[O]fficers of the state . . . who threaten and are about to commence proceedings . . . to enforce against parties affected an unconstitutional act, violating the Federal Constitution, may be enjoined by a Federal court of equity from such action."). Consequently, "[t]he Second Circuit has allowed plaintiffs to invoke . . . *Ex parte Young* . . . where state officials are actively violating federal law or *imminently threatening acts* that the plaintiff challenges." *Goodspeed Airport, LLC v. E. Haddam Inland Wetlands & Watercourses Comm'n*, 632 F. Supp. 2d 185, 188 (D. Conn. 2009) (emphasis added) (collecting cases). Similarly, many "other courts of appeals have held that the challenged action need not literally 'be in progress' . . . ; rather, 'where there is a threat of future enforcement that may be remedied by prospective relief, the ongoing and continuous requirement has been satisfied.'" *Doe v. Annucci*, No. 14 Civ. 2953 (PAE), 2015 WL 4393012, at *16 (S.D.N.Y. July 15, 2015) (quoting *Summit Med. Assocs., P.C. v. Pryor*, 180 F.3d 1326, 1338 (11th Cir. 1999)) (collecting cases). Consequently, courts in this District have allowed complaints seeking injunctive relief under *Ex parte Young* to proceed when a plaintiff "anticipat[es] the threat of future enforcement" and therefore "aims to prevent injury that will occur in the future," *id.* at *17 (citation and quotation marks omitted), or when a plaintiff "sufficiently allege[s] a likelihood that he will be subjected to similar violations in the future," *Babyrev v. Lanotte*, No. 16 Civ. 5421 (ER), 2018 WL 388850, at *5 (S.D.N.Y. Jan. 11, 2018).

Thus, although the 2022 Disbursement occurred in the past, Plaintiffs could still be entitled to injunctive relief under *Ex parte Young* if there exists a threat that the State Defendants are about to violate the Medicaid Act or its implementing regulations.  For a plaintiff to claim the benefit of this rule, however, the state actors sued must actually be threatening to engage in the allegedly unlawful conduct.  For example, in this District a plaintiff has met that burden by alleging that a psychiatric facility's policies authorize the imposition of unlawful restrictions, that such restrictions continue to be imposed, that they have frequently been imposed against the plaintiff in the past, and that the plaintiff plans to engage in future conduct that risks triggering their imposition, *id.*, or by alleging that parole officials are "able, at any time," to terminate a parolee's contact with his child, *Annucci*, 2015 WL 4393012, at *15, and that they have a "history . . . of arbitrarily enforcing, and changing, [the plaintiff's] parole conditions," *id.* at *17.

However, because "conjectural injury cannot warrant equitable relief," district courts err when they rely on *Ex parte Young* to enjoin state officials from enforcing provisions of a statute that those officials had not threatened to enforce in the future.  *Morales v. Trans World Airlines, Inc*, 504 U.S. 374, 382 (1992) (citing *O'Shea v. Littleton*, 414 U.S. 488, 502 (1974)) (narrowing the scope of an overbroad injunction).  For that reason, courts in this Circuit have dismissed complaints seeking relief under *Ex parte Young* that "do not allege facts supporting *any* threat of" future allegedly unlawful conduct, *Knight v. N.Y. State Dep't of Corr.*, No. 18 Civ. 7172 (KMK), 2020 WL 3893282, at *9 (S.D.N.Y. July 10, 2020), that contain "no allegations of a threat of enforcement in the future" and do not "assert a likelihood that [the plaintiff] will be subjected to a similar violation in the future," *KM Enters., Inc. v. McDonald*, No. 11 Civ. 5098 (ADS) (ETB), 2012 WL 4472010, at *11 (E.D.N.Y. Sept. 25, 2012), that "merely claim[] that the [state official] *could* act under the [governing state statutes] should [the plaintiff] choose to" take certain actions and therefore seek "a ruling on the applicability of those state statutes," but "include no allegation

that the [state official] is threatening or about to commence a[n enforcement] action," *Goodspeed Airport*, 632 F. Supp. 2d at 188-89, and that only "suggest[] that the Attorney General might, at some future date, commence criminal proceedings against Plaintiffs," *Wang v. Pataki*, 396 F. Supp. 2d 446, 454 (S.D.N.Y. 2005). *See also Knight*, 2020 WL 3893282, at *9 n.6 (distinguishing the allegations in *Annucci*, which sufficiently established an imminent threat of future unlawful conduct, from those in *Knight*, which did not).

Here, Plaintiffs have failed to sufficiently allege facts showing there to be a threat that the State Defendants will engage in future conduct that is relevantly similar to the 2022 Distribution. While two causes of action in the Amended Complaint plead that the State Defendants "are reasonably likely to make additional Section 438.6(c) submissions to Defendant CMS for approval of ARPA distributions with unlawful provider classes," Am. Compl. ¶¶ 91, 98, such wholly "conclusory" allegations are "not entitled to be assumed true," *Iqbal*, 556 U.S. at 681. Furthermore, in support of those conclusions, the Amended Complaint contains only a single factual allegation related to the State Defendants' future conduct—namely, that "[a]s of January 2022, the NYSDOH was planning to provide the second distribution of funds to the same 'class of providers' as the first distribution." Am. Compl. ¶ 13. But this lone, unsupported allegation— which at most could show what the State Defendants planned half a year before the Amended Complaint was filed—hardly suffices on its own to make plausible the existence of a threat that the State Defendants will engage in future unlawful distributions. Indeed, unlike with the challenges to extant criminal or other statutes regulating individuals' behavior that are typically the subject of *Ex parte Young* suits, where relatively little factual support is necessary to make plausible a threat of future enforcement because state enforcement officials ordinarily possess the power to bring enforcement actions at their own discretion, *see, e.g.*, *Annucci*, 2015 WL 4393012, at *15 (explaining that parole officials possessed the power to unilaterally change the plaintiff's

parole conditions "at any time"),  similar distributions of Medicaid funding would require another lengthy process of coordination between the state and CMS, *cf.* Am. Compl. ¶¶ 52-70 (describing the steps involved in the development of the 2022 Disbursement), since a payment arrangement subject to CMS pre-approval cannot be renewed automatically, 42 C.F.R. § 438.6(c)(2)(ii)(F). Therefore, the state's alleged January 2022 plan to make similar future distributions, on its own, says very little about the likelihood that such distributions will in fact occur.  "[O]nly a complaint that states a plausible claim for relief survives a motion to dismiss," *Iqbal*, 556 U.S. at 679, and the Amended Complaint does not allege enough facts to make plausible that the State Defendants threaten to engage in future allegedly unlawful disbursements, as would be required for equitable relief to be available under *Ex parte Young*, *see, e.g.*, *Clark v. DiNapoli*, 510 F. App'x 49, 51 (2d Cir. 2013) (affirming dismissal where the plaintiff "has alleged injuries stemming only from past conduct *with no plausible threat of future violations*" (emphasis added)).  At best, the Amended Complaint plausibly alleges only that the State Defendants could decide, in the future, to make further disbursements governed by the same methodology as the 2022 Disbursement.  And such a "conjectural injury cannot warrant equitable relief."  *Morales*, 504 U.S. at 382.

While the Court's inquiry into mootness and its inquiry into the availability of equitable relief under *Ex parte Young* both involve examining essentially the same facts, the two inquiries reach different conclusions as to the viability of Plaintiffs' claims against the State Defendants because different standards govern each.  *See Knight*, 2020 WL 3893282, at *9 n.7 (explaining the "procedural and substantive differences between the two questions" of mootness and of the applicability of *Ex parte Young*); *cf. Concentrated Phosphate Export Ass'n*, 393 U.S. at 203-04 (noting, in a case not brought pursuant to *Ex parte Young*, that the defendant's voluntary cessation of unlawful conduct may affect the availability of injunctive relief on the merits even where it does not moot the case).  To show that a case has become moot, the defendant must discharge a "heavy

burden of persuasion" by showing that "subsequent events ma[k]e it absolutely clear that the allegedly wrongful behavior could not reasonably be expected to recur." *Concentrated Phosphate Export Ass'n*, 393 U.S. at 203.  That standard has not been met here:  the State Defendants have not shown that it is "absolutely clear" that future disbursements cannot reasonably be expected to be governed by the same methodology that governed the 2022 Disbursement.  Rather, it is conceivable that the State Defendants will engage in future such disbursements.  Thus, the case is not moot.  However, Plaintiffs bear the burden of "pleading . . . enough facts to state a claim to relief that is plausible on its face," which requires them to "nudge their claims across the line from conceivable to plausible."  *Twombly*, 550 U.S. at 570.  This Plaintiffs have not done.  Thus, with Plaintiffs having failed to plead facts that establish a threat that the State Defendants are about to make other disbursements governed by the same methodology as the 2022 Disbursement, *see Ex parte Young*, 209 U.S. at 156, the State Defendants' motion to dismiss is granted.

### 3.  Leave to Amend

Lastly, the Court considers whether to grant leave to amend.  Under Rule 15(a) of the Federal Rules of Civil Procedure, a court "should freely give leave when justice so requires."  Fed. R. Civ. P. 15(a)(2).  Plaintiffs have not asked the Court for leave to amend their Amended Complaint.  "But even when a party does not ask for leave to amend, the Court may grant leave to amend *sua sponte*."  *In re Garrett Motion Inc. Sec. Litig.*, No. 20 Civ. 7992 (JPC), 2022 WL 976269, at *18 (S.D.N.Y. Mar. 31, 2022) (citation and internal quotation marks omitted) (collecting cases).  When deciding whether to *sua sponte* grant leave to amend, "courts will consider many factors, including undue delay, bad faith or dilatory motive, repeated failure to cure deficiencies, undue prejudice to the opposing party, and futility."  *Morales v. Kimberly-Clark Corp.*, No. 18 Civ. 7401 (NSR), 2020 WL 2766050, at *9 (S.D.N.Y. May 27, 2020) (citation omitted).  After considering these factors, the Court will grant Plaintiffs leave to file a second

amended complaint, in the event that they believe they can plead facts that would make plausible that the State Defendants threaten to make further disbursements governed by the same principles as the 2022 Disbursement.  With no discovery having yet occurred into any future disbursements of Medicaid funds by the State Defendants, that aspect of this case "is still in its infancy, [so] there would be minimal prejudice to [the State] Defendant[s]" in granting leave to amend.  *Id.* at *10.  Furthermore, while Plaintiffs have already amended the Complaint once, events occurring since that amendment may well show that a plausible threat of future allegedly unlawful disbursements does exist.  The Court emphasizes, however, that Plaintiffs should amend as to the State Defendants only if they can overcome the pleading deficiencies outlined in this Opinion and Order.

## II.  The Federal Defendants' Motion to Dismiss or for Summary Judgment

### A.  Background

#### 1.  Facts[5]

Title 42, section 438.6(c) of the Code of Federal Regulations governs when a state may direct an MCO's expenditures and the procedures that a state must follow to secure CMS's approval for such a directed payment.  In particular, it requires that such payments be approved before they are disbursed.  42 C.F.R. § 438.6(c)(2).  On November 15, 2021, Dkt. 64-2 at 2, New York submitted to CMS a section 438.6(c) preprint application, Dkt. 64-3, a document that "implements the prior approval process and must be completed, submitted, and approved by CMS before implementing any of the specific payment arrangements described in 42 C.F.R. § 438.6(c)(1)(i) through (c)(1)(ii) and (c)(1)(iii)(B) through (D)," *id.* at 1.  Following its submission,

---

[5] The following facts are drawn from the Administrative Record, Dkts. 64-2 to 64-14.  *See* 5 U.S.C. § 706 (providing that when reviewing agency action "the court shall review the whole record or those parts of it cited by a party"); *Nat'l Audubon Soc. v. Hoffman*, 132 F.3d 7, 14 (2d Cir. 1997) ("Generally, a court reviewing an agency decision is confined to the administrative record compiled by that agency when it made the decision.").  The Court addresses *infra* Plaintiffs' request that materials outside the administrative record be considered in resolving the Federal Defendants' motion.

CMS concluded that further information was necessary before the preprint could be reviewed. Dkt. 64-4.  On December 23, 2021, Dkt. 64-2 at 2, New York then submitted a revised preprint, Dkt. 64-5, as well as proposed language amending its contracts with the MCOs that administer its Medicaid program, Dkt. 64-6, and a plan for evaluating the success of the directed payment, Dkt. 64-7.  This documentation, CMS determined, was "adequate . . . to begin [its] review."  Dkt. 64-8 at 1.  On January 19, 2022, the Potomac Law Group, counsel to Plaintiffs in this litigation, wrote a letter to CMS urging that the preprint be rejected for many of the same reasons that Plaintiffs advance before this Court.  Dkt. 64-9.  Subsequently, on February 1, 2022, Dkt. 64-2 at 2, New York submitted a revised preprint application, Dkt. 64-10, accompanied by its responses to CMS's first round of questions concerning the application, Dkt. 64-11.  Then, on February 23, 2022, Dkt. 64-2 at 2, New York submitted a further revised, and final, preprint application, Dkt. 64-12 ("Final Preprint Application"), accompanied by its responses to CMS's second round of questions concerning the application, Dkt. 64-13 ("Second State Responses").  CMS approved this final revision of the preprint application on March 4, 2022.  Dkt. 64-14.

The preprint application completed by New York contained a number of questions soliciting information about the proposed state-directed payment.  The application first provided basic information about the nature and structure of the planned payment, explaining that it would cover the "contract rating period(s)" from "April 1, 2021 through March 31, 2022," Final Preprint Application § 1, that the payment would be made on March 30, 2022, *id.* § 2, that it would apply only to certain managed care programs, *id.* § 3, and that the total amount would be $361.25 million, with half that amount funded by the federal government, *id.* § 4.  The preprint application contained additional, more substantive questions requiring more detailed answers from New York; in particular, it asked the state to "define the provider class(es)" that would receive funding through the directed payment.  *E.g.*, *id.* § 20.b.  In response, New York explained in the Final Preprint

Application that the "provider class includes [LHCSAs] whose managed care revenue received from [certain healthcare plans] in CY 2019 falls in the top third of providers in their designated MLTC rate region and have completed required attestations and surveys." *Id.*  As a "justification for the provider class," New York explained that the payment "is aimed at increasing the quality and capacity of the HCBS workforce," and that the "emphasis on the top third provides for greater, more targeted and meaningful investments, while the regional division leads to support in both urban and rural areas." *Id.* § 20.c.  Furthermore, as New York explained, the requirement that recipients complete a survey "will provide key baseline data on the state of the LHCSA workforce" and the requirement that they make certain attestations "will allow the State to distribute funds to providers that commit to using [those funds] consistent with the purpose of this preprint." *Id.*

The Final Preprint Application contained additional details from New York as to the structure of the proposed payment.  It would "require plans to pay a uniform dollar amount," *id.* § 19.a, in particular, a uniform increase of "$3.80 per hour of service," *id.* § 19.b.  This amount was determined by "divid[ing] the $361 million by the total hours of service provided by LHCSAs in the provider class for enrollees in the applicable managed care plans from April to September 2021." *Id.* § 19.d.  That is, New York proposed dividing the total amount of funding available by the number of hours of service provided in that time period to determine the funding available per hour of service provided, then paying each LHCSA that sum of money for each hour of service that the LHCSA had provided.  According to New York, this "payment arrangement is based on the utilization and delivery of services for enrollees covered under the contract" because the payments "will be based on the utilization of services by enrollees in applicable managed care plans from April 1, 2021 through September 30, 2021, such that distribution is based on utilization in the same rating year for which the funds would be paid." *Id.* § 8.  New York further explained in the Final Preprint Application that this arrangement "directs expenditures equally, using the

same terms of performance, for the class . . . of providers . . . providing the service under the contract" because "[p]lans will pay providers according to the units of service they provided to enrollees in the applicable Medicaid managed care programs from April 2021 through September 2021." *Id.* § 21.

Additionally, the Final Preprint Application conveyed assurance from New York that the 2022 Disbursement would satisfy various requirements set forth in 42 C.F.R. § 438.6(c)(2)(ii)(C)-(F). First, it affirmed that "the payment arrangement does not condition network provider participation on the network provider entering into or adhering to intergovernmental transfer agreements." Final Preprint Application § 38. Similarly, it affirmed that "the payment arrangement is not renewed automatically," *id.* § 7, and that "the State expects this payment arrangement to advance at least one of the goals and objectives in the quality strategy required per 42 C.F.R. § 438.340," *id.* § 39. In particular, the payment arrangement was expected to advance two such goals—namely, to "Promote Prevention with Access to High Quality Care – Network Adequacy" and to "Support Members in Their Communities." *Id.* tbl. 7, at 19. It would achieve the former by "[i]ncreas[ing] the number of health care providers to provide appropriate access to care for Medicaid enrollees, which includes being geographically accessible (meeting time/distance standards based on geographic location), being accessible for the disabled, and promoting and ensuring the delivery of services in a culturally competent manner." *Id.* And it would achieve the latter by "[e]xpand[ing] access to high-quality care in the least restrictive settings." *Id.* Lastly, New York affirmed that it had "an evaluation plan which measures the degree to which the payment arrangement advances" those goals, *id.* § 44.a, and further described the metrics that would be employed in that evaluation plan, *id.* tbl. 8, at 20.

As mentioned, in addition to the Final Preprint Application itself, the administrative record contains the State Defendants' answers to two rounds of questions asked by CMS about the

proposed payment plan.  Some of these questions and answers touched on issues relevant to this litigation.  In its first round of questions, CMS explained that "[i]f the state intends to continue this payment arrangement in future years, it would need to obtain approval for this payment arrangement for each successive year," and requested that New York "acknowledge this policy." Second State Responses ¶ 1.  In response, New York "acknowledge[d] this policy" and confirmed that it would "seek separate approval for any subsequent payments in future rate years."  *Id.*

In the same round of questions, CMS also noted that it "ha[d] received concerns form stakeholders about this . . . provider class"—referring presumably to the letter sent by Plaintiffs' counsel, *see* Dkt. 64-9—and pressed New York on a number of points related to the definition of the provider class employed in the Final Preprint Application.  Second State Responses ¶ 6.  First, CMS asked New York to explain "the rationale for excluding the other LHSCAs," *id.* ¶ 6.a, that is, for excluding LHSCAs "whose managed care revenue" did not "fall[] in the top third of providers" in each region, *id.* ¶ 6.  And CMS further asked how "the state envision[s] that its 'emphasis on the top third' will provide for 'greater, more targeted and meaningful investments.'" *Id.* ¶ 6.b.  In response, New York explained that the exclusion was designed to "maximize the impact of these funds in achieving the goals of the preprint."  *Id.* ¶ 6.a.  In particular, the top third of providers by revenue "comprise the ***vast*** majority of Medicaid service delivery at 92% of total Medicaid spend for personal care services provided by LHCSAs."  *Id.*  Thus, the revenue of the "hundreds of very small providers in the bottom two-thirds . . . only total[s] 8% of Medicaid spend for personal care services provided by LHCSAs."  *Id.*  Given that the 2022 Distribution was to be paid out to LHCSAs based on the number of hours of service they provided, the awards given to these hundreds of very small LHCSAs would themselves be very small—for example, "about 350 LHCSAs would receive less than $1,000."  *Id.*  And, in New York's view, awards of such small size would be "unlikely" to "have a meaningful impact on workforce development and VBP [*i.e.,*

value-based payment] readiness for the personal care sector." *Id.*  In particular, such small awards could be used only to make small, cheap investments rather than "the types of meaningful investments necessary to drive real progress in the personal care workforce." *Id.* ¶ 6.c.  Instead, under the proposed provider class, the eligible LHCSAs would receive "larger amounts of funding" that could be employed in making meaningful investments, and the 2022 Disbursement would be directed to "the LHCSAs that are positioned to use it most effectively." *Id.* ¶ 6.b.

### 2. Procedural History

Following Plaintiffs' filing of the Amended Complaint, the Federal Defendants filed a certified copy of the administrative record of CMS's approval of the 2022 Disbursement, Dkt. 64, and moved to dismiss or, in the alternative, for summary judgment, Dkts. 63, 65 ("Fed. Defts. Br."), on the same date that the State Defendants moved to dismiss, September 2, 2022.  In their memorandum of law submitted on October 14, 2022 to oppose the State Defendants' motion to dismiss, Plaintiffs also opposed the Federal Defendants' motion.  Pls. Opp. at 12-15, 21-30.  The Federal Defendants replied on November 14, 2022.  Dkt. 77 ("Fed. Defts. Reply").  In addition, on the same day that Plaintiffs opposed the State Defendants' and the Federal Defendants' motions, they moved by letter for the admission of two types of evidence beyond the administrative record. Dkt. 70.  First, Plaintiffs sought the admission of expert testimony, *see id.* at 1-3, in the form of two declarations attached as exhibits to their memorandum of law in opposition to the State and the Federal Defendants' motions, *see* Dkt. 71-1, 71-2.  Second, Plaintiffs requested that the court order the Federal Defendants to produce the actuarial rate certifications referenced in table 3 of the Final Preprint Application, *see* Final Preprint Application tbl. 3, at 12-13, which would have certified that the rates paid to MCOs, including the 2022 Disbursement, were actuarially sound. *See* Dkt. 70 at 3.  Both the State Defendants, Dkt. 72, and the Federal Defendants, Dkt. 73, submitted letters opposing Plaintiffs' motion for extra-record evidence.  The Court then set a

schedule for the parties to more fully brief the motion.  Dkt. 75.  Plaintiffs submitted their brief on November 15, 2022, Dkt. 79 ("Pls. Discovery Br."); the State Defendants and the Federal Defendants each filed briefs in opposition on December 6, 2022, Dkts. 80-81; and Plaintiffs replied in support of the motion on December 16, 2022, Dkt. 82.

**B. Discussion**

In moving for the admission of evidence beyond the administrative record, Plaintiffs concede that such evidence is presumptively inadmissible but argue that two exceptions to that presumption apply in this case—namely, an exception allowing a court to consider such evidence allegedly addressing an important aspect of the problem that the agency failed entirely to consider, and an exception allowing the court to consider such evidence as background information when confronted with complex issues.  Pls. Discovery Br. at 1-2.  The applicability of each of these two exceptions, however, depends in part on the Court's analysis of the preprint approval process: whether the evidence for which admission is sought addresses an important aspect of the problem facing CMS depends on exactly what problem CMS was facing, and whether that evidence provides background information relevant to the approval process depends on exactly what questions the approval process must consider.  Thus, the Court will begin by analyzing on the merits whether CMS's approval was consistent with governing law and regulation, and in so doing will identify CMS's obligations in reviewing the preprint application.  That analysis, in turn, will reveal whether the evidence Plaintiffs seek to admit falls under either exception to the presumption that the Court's review of CMS's approval should be limited to the administrative record.

**1. CMS's Approval of the 2022 Disbursement**

In the Amended Complaint, Plaintiffs claim that CMS's approval of the 2022 Disbursement violated provisions of federal law, including a subsection of the APA, 5 U.S.C. § 706(2), *see* Am. Compl. ¶ 74, a subsection of the Medicaid Act, 42 U.S.C. § 1396b(m)(2)(A)(iii), *see* Am. Compl.

¶¶ 75, 79, 87, and various subsections of its implementing regulations, namely 42 C.F.R. § 438.4(a), 42 C.F.R. § 438.4(b)(4), 42 C.F.R. § 438.4(b)(7), and 42 C.F.R. § 438.5, *see* Am. Compl. ¶ 84, 42 C.F.R. § 438.6(c)(1), *see* Am. Compl. ¶ 83, and 42 C.F.R. § 438.6(c)(2)(B), *see* Am. Compl. ¶ 82. *See also id.* ¶¶ 71-72; Pls. Opp. at 23. In response, the Federal Defendants argue that CMS's approval of the preprint application complied with all relevant provisions of federal law.[6] Fed. Defts. Br. at 14-20. Therefore, the Court will examine in turn each of the provisions that Plaintiffs allege CMS violated in approving the Final Preprint Application.

### a. 42 C.F.R. § 438.6(c)(1)

Although the Amended Complaint alleges that CMS's approval of the Final Preprint Application violated 42 C.F.R. § 438.6(c)(1), Am. Compl. ¶ 83, Plaintiffs' opposition brief does not cite that provision in arguing that CMS's approval was unlawful, *see* Pls. Opp. at 22-24. Nonetheless, because section 438.6(c)(1) sets forth the general rules governing directed payments, the Court begins there. That section provides that "[e]xcept as specified in this paragraph (c), [or in other specified provisions], the State may not direct the MCO's . . . expenditures under the contract." 42 C.F.R. § 438.6(c)(1). Among the exceptions specified in paragraph (c), in turn, is one under which "[t]he State may require the MCO . . . to . . . (C) Provide a uniform dollar or percentage increase for network providers that provide a particular service under the contract." 42 C.F.R. § 438.6(c)(1)(iii). As mentioned, the Final Preprint Application explained that the "type of

---

[6] The Federal Defendants also argue that Plaintiffs lack prudential standing under the APA because they "do not fall within the zone of interests protected by the challenged portions of the Medicaid Act or its related regulations." Fed. Defts. Br. at 10. Because the Court concludes that CMS's approval of the Final Preprint Application did not violate federal law, it assumes *arguendo*—but does not hold—that Plaintiffs fall within the zone of interests protected by the Medicaid Act and its implementing regulations. The Court is not required to address the zone-of-interests test as a threshold question because—although there has been confusion on this point in the past—"the Supreme Court recently clarified in its *Lexmark* [*International Inc. v. Static Control Components, Inc.*, 572 U.S. 118 (2014)] decision that the zone-of-interests test actually determines whether a plaintiff has a right to sue under a particular substantive law, and is not of jurisdictional import." *Fed. Defenders of N.Y., Inc. v. Fed. Bureau of Prisons*, 954 F.3d 118, 128 (2d Cir. 2020).

state directed payment for which the State is seeking prior approval" was a "Uniform Dollar or Percentage Increase." Final Preprint Application ¶ 16.  In particular, the Final Preprint Application proposed a uniform dollar increase of $3.80 in the rate paid to LHCSAs for each hour of home-care services they provided between April 2021 and September 2021.  *Id.* ¶ 19.a-.c.  Because that proposal would provide a uniform increase of that amount for every hour of home-care services provided under the contract by an LHCSA in the provider class, the then-proposed 2022 Disbursement fell within the exception for "a uniform dollar . . . increase for network providers that provide a particular service under the contract."  42 C.F.R. § 438.6(c)(1)(iii)(C).  Thus, CMS's approval of the Final Preprint Application was consistent with the prohibition on state-directed payments found in 42 C.F.R. § 438.6(c)(1).

### b.  42 C.F.R. § 438.6(c)(2)(ii)

The next subsection of 42 C.F.R. § 438.6(c) governs the "[p]rocess for approval" of a state-directed payment.  42 C.F.R. § 438.6(c)(2).  "Contract arrangements that direct the MCO's . . . expenditures under paragraphs (c)(1)(i) and (ii) and (c)(1)(iii)(B) through (D) of this section must have written approval prior to implementation."  *Id.*  As mentioned, the Final Preprint Application proposed increasing payment rates by $3.80 for every hour of home care services provided by LHCSAs in the provider class, as authorized under 42 C.F.R. § 438.6(c)(1)(iii)(C).  Final Preprint Application ¶ 19; *see* 42 C.F.R. § 438.6(c)(1)(iii)(C) (authorizing "a uniform dollar . . . increase for network providers that provide a particular service under the contract").  Because that subsection falls between 42 C.F.R. § 438.6(c)(1)(iii)(B) and 42 C.F.R. § 438.6(c)(1)(iii)(D), the 2022 Disbursement required written approval prior to implementation.

In order "[t]o obtain written approval, a State must demonstrate, in writing, that the arrangement" satisfies six criteria that are set forth from 42 C.F.R. § 438.6(c)(2)(ii)(A) through (F).  42 C.F.R. § 438.6(c)(2)(ii).  Plaintiffs appear to contend that CMS's approval of the Final

Preprint Application was unlawful because New York failed to demonstrate that the proposed state-directed payment would satisfy the first two criteria, which are set forth at 42 C.F.R. § 438.6(c)(2)(ii)(A) and 42 C.F.R. § 438.6(c)(2)(ii)(B).  Pls. Opp. at 28; *see also* Am. Compl. ¶ 82.[7]

The first of those criteria requires a state to demonstrate that the proposed directed payment "is based on the utilization and delivery of services."  42 C.F.R. § 438.6(c)(2)(ii)(A).  As mentioned, in the Final Preprint Application, New York was required to "describe in detail how the payment arrangement is based on the utilization and delivery of services for enrollees covered under the contract."  Final Preprint Application ¶ 8.  And, as New York explained in the Final Preprint Application, "[p]ayments made to providers will be based on the utilization of services by enrollees in applicable managed care plans from April 1, 2021 through September 30, 2021." *Id.*  That is, the "uniform dollar increase . . . will be applied to each hour of service from the selected dates of service to determine the amount that each provider will receive," *id.* § 19.d, and therefore each provider would be paid $3.80 for each hour of service provided between April 1, 2021 and September 30, 2021.  Because under this arrangement the amount of money paid to each LHCSA depends on the number of hours of home-care services provided during the relevant

---

[7] While the Amended Complaint alleges that the Federal Defendants violated 42 C.F.R. § 438.6(c)(2)(ii)(B), the pleading is devoid of any mention of subsection (A).  *See, e.g.*, Am. Compl. ¶ 76 (alleging that the Federal Defendants violated the APA because, *inter alia*, DOH's first directed payment "fails to meet CMS' regulations, including at 42 C.F.R. § 438.6(c)(1)(i)-(iii), (c)(2)(i), (c)(2)(ii)(B), § 438.4(a), (b)(4), (b)(7), and § 438.5"); *see also id.* ¶ 71 ("CMS' approval is in clear violation of its regulations, *see* 42 C.F.R. § 438.6(c)(1)(i)-(iii), (c)(2)(i), (c)(2)(ii)(B), § 438.4(a), (b)(4), (b)(7), § 438.5, as well as its various guidance documents discussing those regulations.").  Yet, in their opposition brief, Plaintiffs argue that the 2022 Disbursement was unlawful because, *inter alia*, "it was not 'based on the utilization and delivery of services' in the contract period."  Pls. Opp. at 22 (quoting 42 C.F.R. § 438.6(c)(2)(ii)(A)).  In the interest of thoroughness, the Court will address herein why CMS's pre-approval of the 2022 Disbursement did not violate section 438.6(c)(2)(ii)(A).

period, this arrangement plainly is "based on the utilization and delivery of services," 42 C.F.R. § 438.6(c)(2)(ii)(A):  each eligible LHCSA was paid based on the number of hours it delivered.

In arguing that CMS's approval nonetheless violated section 438.6(c)(2)(ii)(A), Plaintiffs contend that "CMS approved a plan in which NYSDOH paid out money based on a reverse-engineered formula, untethered to *any* added costs connected to the utilization and delivery of services during the contract period."  Pls. Opp. at 24.  For a number of reasons, however, this argument misses the mark.  First, Plaintiffs' argument that the 2022 Disbursement was not based on the *costs connected to* the utilization and delivery of services simply attempts to rewrite the text of the regulation:  under 42 C.F.R. § 438.6(c)(2)(ii)(A), the proposed arrangement must be based on the utilization and delivery of services, not on the costs connected thereto.  And, as discussed, the 2022 Disbursement, as laid out in the Final Preprint Application, was based on the utilization and delivery of services, since each LHCSA was paid a set amount for each hour of service delivered.  Second, while Plaintiffs complain about the "reverse-engineered formula," they provide no cogent argument for why the approach New York employed is inconsistent with section 438.6(c)(2)(ii)(A).  New York appears to have determined what uniform amount to pay per hour of utilization by determining how much it could pay per hour without exceeding the full amount of funding available.  *See* Final Preprint Application § 19.d.  And section 438.6(c)(2)(ii)(A) simply requires the total amount paid to depend on the amount of services delivered and utilized by patients; it does not further require the rate of payment—the amount paid for each unit of services delivered and utilized—also to depend on the utilization and delivery of services.[8]  Furthermore,

---

[8] Indeed, in promulgating the regulation, CMS explained that the provision would "allow[] states to direct MCO . . . *expenditures* only based on the utilization, delivery of services to enrollees covered under the contract, or the quality and outcomes of services."  Medicaid and Children's Health Insurance Program (CHIP) Programs, 81 Fed. Reg. 27,498, 27,588 (May 6, 2016) (emphasis added).  Thus, as this description reveals, it is the "expenditures" that must be directed "based on . . . delivery of services to enrollees covered under the contract"—a requirement satisfied

even under Plaintiffs' position that the amount of the increase in payment per unit of services also must itself be based on the utilization and delivery of services, New York's method to arrive at the amount of the increase did depend on the utilization and delivery of services:  the rate increase equaled the total funding available divided by the total number of hours of home care services that were utilized and delivered.  Plaintiffs' primary complaint appears to be not that the rate was not set based on the amount of services utilized and delivered, but rather that the costs of providing those services did not influence the amount of the rate increase.  But as discussed, the plain text of 42 C.F.R. § 438.6(c)(2)(ii)(A) concerns only the utilization and delivery of services, not their associated costs.

Next, the state must demonstrate "that the arrangement . . . (B) Directs expenditures equally, and using the same terms of performance, for a class of providers providing the service under the contract."   42 C.F.R. § 438.6(c)(2)(ii)(B).  Plaintiffs argue that the Final Preprint Application failed to make this showing because a class of LHCSAs defined by revenue is not a "true '*class* of providers'" but is rather just "the largest and most well-heeled providers within a class." Pls. Opp. at 10.  Thus, in Plaintiffs' view, 42 C.F.R. § 438.6(c)(2)(ii)(B) cannot be satisfied if the relevant provider class is defined in part in terms of the revenue earned by each provider. This argument, however, is not supported by the text of the regulation itself.  A class is simply "a group, set, or kind sharing common attributes," *Class*, Merriam-Webster, https://www.merriam-webster.com/dictionary/class (last accessed July 8, 2023), and members of the provider class defined in the Final Preprint Application manifestly do share common attributes, since they are all LHCSAs, they all meet the applicable revenue threshold, and they all completed certain attestations and surveys, Final Preprint Application § 20.b (defining the provider class as (1)

_____

when the number of hours of home care services each provider delivers determines the amount of money it is paid.  There is no additional requirement that the amount of money paid per unit of services delivered must also in some further way depend on the utilization and delivery of services.

LCHSAs that (2) meet the revenue threshold and (3) have completed certain attestations and surveys).  By contrast, Plaintiffs cite nothing in the language of the regulation or in the meaning of the term "class" that would justify reading 42 C.F.R. § 438.6(c)(2)(ii)(B) to permit payments to be directed only to a class of providers defined by the type of services they provide alone, and not also by their revenue.  Indeed, CMS knew how to write a regulation imposing such a restriction on eligible provider classes:  in CMS's initial proposed rule, section 438.6(c)(2)(i)(B) required states to demonstrate that their proposed payment "[d]irects expenditures equally, and using the same terms of performance, for *all* public and private providers providing the service under the contract."  Proposed Rule Concerning Medicaid and CHIP Programs and Managed Care, 80 Fed. Reg. 31,098, 31,259 (June 1, 2015) (emphasis added).  Plaintiffs seek to read such language into the final rule that CMS actually promulgated, but it is not there.  Because the plain text of the regulation places no limitation on the classes of providers to which a state may direct a payment, and because Plaintiffs do not dispute that the 2022 Disbursement distributed funds equally, under the same terms of performance, to all LHCSAs with revenues in the top third for their region, CMS did not err in concluding that the Final Preprint Application satisfied this requirement, and it did not violate 42 C.F.R. § 438.6(c)(2)(ii)(B) by approving the Final Preprint Application.

### c.  42 C.F.R. §§ 438.4, 438.5, 438.6(c)(2)(i); 42 U.S.C. § 1396b(m)(2)(A)(iii)

Next, Plaintiffs attack the lawfulness of CMS's pre-approval of the First Preprint Application by appealing to a number of provisions that do not themselves govern the pre-approval process.  *See* Am. Compl. ¶¶ 71, 76, 84.  As mentioned, 42 C.F.R. § 438.6(c)(2)(ii) requires certain state-directed payments to be pre-approved before they are disbursed, then identifies six criteria that the state must show the payment to satisfy in order to secure pre-approval.  Prior to setting forth that process for pre-approval, however, that regulation first provides that "[a]ll contract arrangements that direct the MCO's . . . expenditures under paragraphs (c)(1)(i) through (iii) of

this section must be developed in accordance with § 438.4, the standards specified in § 438.5, and generally accepted actuarial principles and practices." 42 C.F.R. § 438.6(c)(2)(i). The separate sections referenced in that provision, in turn, govern "Actuarial Soundness," *see id.* § 438.4, and "Rate Development Standards," *see id.* § 438.5. Plaintiffs contend that CMS's approval of the Final Preprint Application violated 42 C.F.R. § 438.6(c)(2)(i) and various subsections of 42 C.F.R. § 438.4 and § 438.5, Pls. Opp. at 22; Am. Compl. ¶ 84, primarily because the 2022 Disbursement was not actuarially sound. *See* Pls. Opp. at 23 (accusing CMS of "ignor[ing] core concepts of actuarial soundness and . . . approv[ing] a directed payment proposal that is clearly developed in a manner antithetical to basic principles of actuarial soundness"). These arguments all suffer from the same flaw. The regulatory provisions Plaintiffs cite all govern how the states must administer their Medicaid programs, not how CMS must pre-approve state-directed payments. And because those provisions do not create any obligations that CMS must discharge in the course of pre-approving a state's application to make a state-directed payment, CMS's approval of the Final Preprint Application could not have violated any of them.

By its terms, 42 C.F.R. § 438.6(c)(2)(i) governs the process by which state-directed payments must be developed. This provision is violated when a state-directed payment is not developed in accordance with section 438.4, the standards specified in section 438.5, or generally accepted actuarial principles and practices. 42 C.F.R. § 438.6(c)(2)(i). Plaintiffs, however, do not claim that CMS *developed* the Final Preprint Application or the 2022 Disbursement in violation of any applicable regulatory provision, and the administrative record clearly reveals that CMS did not develop it at all; instead, New York developed the Final Preprint Application and the 2022 Disbursement, and CMS's role was limited to pre-approval before the disbursement was paid out. The question of whether New York lawfully developed the 2022 Disbursement in accordance with those rules—for example, by developing a state-directed payment that was actuarially sound—is

simply a different question from whether CMS lawfully pre-approved it pursuant to the six criteria in 42 C.F.R. § 438.6(c)(2)(ii).  And because 42 C.F.R. § 438.6(c)(2)(i) sets forth rules that specify how the states must develop state-directed payments, not rules that specify whether CMS should pre-approve a state-directed payment that a state has already developed, CMS's pre-approval of the Final Preprint Application could not have violated section 438.6(c)(2)(i).

Furthermore, neither of the two sections incorporated by reference into section 438.6(c)(2)(i)—that is, 42 C.F.R. § 438.4 and § 438.5—independently imposes any requirements on how CMS conducts the pre-approval process.  Section 438.4 generally governs actuarial soundness, first defining the concept, *id.* § 438.4(a), then setting forth the substantive standards that the reimbursement rates proposed by the state must meet in order for CMS to approve them as actuarially sound, *id.* § 438.4(b)-(c).  But while CMS therefore cannot approve the state's proposed rates without evaluating whether they are actuarially sound, the process for approving such rates, *see* 42 C.F.R. §§ 438.3(a), 438.3(c), 438.7, is distinct from the pre-approval process for state-directed payments, set forth at 42 C.F.R. § 438.6(c)(2)(ii).  Thus, while CMS pre-approved the state-directed payment arrangement in the Final Preprint Application without considering whether it complied with the substantive principles of actuarial soundness set forth in 42 C.F.R. § 438.4(b)-(c), it did not thereby violate that provision, which requires those principles to be considered only when CMS approves the state's proposed payment rates.

Section 438.5, in turn, governs how states must develop their proposed rates—for example, by defining the steps that "the State must follow" when "setting actuarially sound capitation rates," *id.* § 438.5(b), requiring "States and their actuaries [to] use the most appropriate data," *id.* § 438.5(c)(2), and requiring "States [to] provide all the validated encounter data, FFS [*i.e.*, fee-for-service] data (as appropriate), and audited financial reports," *id.* § 438.5(c)(1), in addition to imposing further requirements, *see id.* § 438.5(d)-(g).  By their express terms, however, these

provisions apply to the states responsible for developing the reimbursement rates, not to CMS itself.   Thus, CMS did not violate federal law when, in pre-approving the Final Preprint Application, it did not take the steps that section 438.5 requires states to take when proposing their reimbursement rates, because that section imposes no obligations on CMS at all.

Lastly, Plaintiffs cite a provision of the Medicaid Act itself, which provides that "no payment shall be made under this subchapter to a State with respect to expenditures incurred by it for payment . . . for services provided by any entity . . . which is responsible for the provision" of healthcare services, directly or indirectly, unless various conditions are met, including the condition that "(iii) such services are provided for the benefit of individuals eligible for benefits under this subchapter in accordance with a contract between the State and the entity under which prepaid payments to the entity are made on an actuarially sound basis."   42 U.S.C. § 1396b(m)(2)(A).   Plaintiffs argue that CMS violated this provision because it "approved a payment from the NYSDOH to its MCOs that was not 'made on an actuarially sound basis.'"  Pls. Opp. at 22.  But this provision of the Medicaid Act, like the regulations considered *supra*, does not govern CMS's pre-approval of state-directed payments; instead, it governs a different component of Medicaid administration—namely, the payment of federal funds to the individual states to reimburse them for the Medicaid payments they make to insurance companies or healthcare providers.  But the actual payment of funds to reimburse states for expenses incurred is simply a different action than the pre-approval of a state-directed payment, and the regulation governing pre-approval, 42 C.F.R. § 438.6(c)(2)(ii), is separate from the regulations establishing procedures for ensuring that Medicaid payments reimbursing states for managed care expenses comply with federal law, *see, e.g.*, 42 C.F.R. pt. 438, subpt. j (setting forth "Conditions for Federal Financial Participation" in managed care).  CMS's pre-approval of the Final Preprint Application could not have violated 42 U.S.C. § 1396b(m)(2)(A)(iii), because that section imposes requirements on

when federal funds may be paid to the states, not requirements on when CMS may pre-approve a state-directed payment.

Thus, the various statutory and regulatory provisions Plaintiffs cite cannot form the basis of an argument that CMS's pre-approval of the Final Preprint Application was unlawful, because none of those provisions govern the state-directed payment pre-approval process. In response, Plaintiffs argue that because federal law generally requires states' Medicaid payments to MCOs to be actuarially sound, CMS must consider actuarial soundness when pre-approving a state-directed payment: "While CMS's regulations do not require a formal rate certification for each directed payment, the lack of a formal certification process does not provide CMS with carte blanche to ignore core concepts of actuarial soundness and to approve a directed payment proposal that is clearly developed in a manner antithetical to basic principles of actuarial soundness." Pls. Opp. at 23 (citation omitted). In effect, then, Plaintiffs ask the Court to require CMS to consider actuarial soundness when pre-approving state-directed payments, given the overall importance of that concept to how Medicaid functions, even though no federal statute or regulation imposes such a requirement. But courts lack the authority to restrict the discretion of administrative agencies beyond the restrictions imposed by law. *See Little Sisters of the Poor Saints Peter & Paul Home v. Pennsylvania*, 140 S. Ct. 2367, 2381 (2020) (explaining that courts cannot "impos[e] limits on an agency's discretion that are not supported by the text" of federal law). Certainly, federal law could require through statute or regulation that CMS pre-approve state-directed payments only upon a finding that the payments comply with all applicable provisions of federal law. But it does not; instead, federal law expressly enumerates only six criteria that a state-directed payment must satisfy to win pre-approval. Those are listed at 42 C.F.R § 438.6(c)(2)(ii)(A)-(F) and do not include actuarial soundness. And since federal law does not impose any further requirements on pre-approval, neither may this Court.

### d.  5 U.S.C. § 706(2)[9]

In addition to arguing that CMS's pre-approval of the Final Preprint Application was substantively unlawful, in that it violated governing provisions of the Medicaid Act and its implementing regulations, Plaintiffs argue that the pre-approval was procedurally unlawful, in that it violated governing provisions of the APA—namely, the provision authorizing a reviewing court to "hold unlawful and set aside agency action . . . found to be— (A) arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with law."  5 U.S.C. § 706(2); *see* Pls. Opp. at 24.  In particular, Plaintiffs argue that CMS's pre-approval was arbitrary and capricious because the agency "failed to consider whether the approved payment would violate the statutory requirement that state directed payments be actuarially sound and the regulatory requirement that the payment 'be developed in accordance with § 438.4, the standards specified in § 438.5, and generally accepted actuarial principles and practices,'" Pls. Opp. at 25 (citation omitted), to "examine, or ask NYSDOH to illustrate, how the larger LHCSAs experienced higher costs during the 2021-2022 contract period than the smaller LHCSAs, which could theoretically justify breaking up a class of providers," *id.* at 27, or to "ask a single question to NYSDOH about whether harm to the smaller LHCSAs from this payment arrangement would result in an inability for diverse Medicaid beneficiaries in New York to obtain adequate services and appropriate care," *id.* at 28.  Thus, Plaintiffs, conclude, "CMS failed to consider ***several*** important aspects of the problem, rendering its approval arbitrary and capricious."  *Id.*

---

[9] While Plaintiffs' Amended Complaint alleges that CMS's approval of the 2022 Disbursement violated 5 U.S.C. § 706(2)(C), Am. Compl. ¶ 74, Plaintiffs' opposition brief defends their APA claim by arguing that the approval was "arbitrary and capricious," Pls. Opp. at 24 (capitalization omitted), language found instead in subsection 5 U.S.C. § 706(2)(A).  Nonetheless, because those different subsections do not require courts to employ different substantive standards in evaluating the lawfulness of agency action, the Court will disregard this difference in how Plaintiffs framed their argument in the Amended Complaint and in their brief.

A court's review of agency action under 5 U.S.C. § 706(2)(A) is "narrow and deferential, and limited to examining the administrative record to determine whether the agency decision was based on a consideration of the relevant factors and whether there has been a clear error of judgment." *Kakar v. U.S. Citizenship & Immigr. Servs.*, 29 F.4th 129, 132 (2d Cir. 2022) (internal quotation marks omitted).  The "relevant factors" that an agency must consider for its decision to be upheld are identified by the provisions of law that govern the challenged agency action.  In *Kakar*, for example, the United States Citizenship and Immigration Services ("USCIS") deemed the plaintiff inadmissible because it found that he had engaged in "terrorist activities" in Afghanistan. *Id.* at 131.  In holding USCIS's decision arbitrary and capricious, the Second Circuit concluded that "the agency failed to consider an important aspect of the issue, namely, whether Kakar's actions would have been unlawful under the laws of Afghanistan or the United States," because, under the governing statute, "terrorist activity" includes only "activity which is unlawful under the laws of the place where it is committed (or which, if it had been committed in the United States, would be unlawful under the laws of the United States or any State)." *Id.* at 133 (citation and internal quotation marks omitted).  Thus, whether the plaintiff's conduct was unlawful under Afghani or American law was relevant because the governing provision of federal law explicitly required his admissibility to depend on that factor.  Similarly, in *Natural Resources Defense Council v. United States Environmental Protection Agency*, 808 F.3d 556 (2d Cir. 2015), the Second Circuit held it arbitrary and capricious for the Environmental Protection Agency not to have considered whether certain types of available technology could be employed in controlling pollution from ballast water discharge because federal law "requires the 'application of the *best available technology economically achievable*.'" *Id.* at 570 (citation omitted).  By contrast, an agency's action is not arbitrary and capricious when it fails to consider factors that it need not consider under the governing provisions of federal law.  *See, e.g.*, *Residents for Sane Trash*

*Solutions v. U.S. Army Corps of Eng'rs*, 31 F. Supp. 3d 571, 592 (S.D.N.Y. 2014) (holding that the Army Corps of Engineers' issuance of a permit for a garbage processing facility was not arbitrary and capricious, even though the Corps failed to consider "supposedly better alternatives," because the "Corps was not required to assess every conceivable alternative" under a statute that "merely requires that the Corps consider a reasonable range of alternatives to the applicant's proposed action").

Thus, while Plaintiffs may have identified certain factors that CMS failed to consider, that failure would render CMS's decision arbitrary and capricious only if federal law required CMS to consider those factors. The Federal Defendants deny that federal law imposes such a requirement. The regulation establishing the pre-approval process, they argue, "does not obligate CMS to consider at the pre-approval stage whether the payment was actuarially sound," Fed. Defts. Reply at 7; instead, "the agency plainly considered the issues required by the regulation," *id.*  The Court agrees.  CMS may not have considered whether the 2022 Disbursement would be actuarially sound when pre-approving the Final Preprint Application, but, as the Court has discussed at length, *see supra* III.B.1.b-c, no provision governing that pre-approval requires CMS to consider that factor. Similarly, in evaluating whether the 2022 Disbursement "[d]irects expenditures equally, and using the same terms of performance, for a class of providers providing the service under the contract," 42 C.F.R. § 438.6(c)(2)(ii)(B), CMS may not have considered whether a difference in cost would justify defining the provider class to contain only LHCSAs with revenues in the largest one-third for their region, but the relevant regulation does not require limitations on the applicable provider class to be justified on that basis—or, indeed, on any particular basis.  Lastly, while CMS may not have considered how restricting the provider class for the 2022 Disbursement might affect diverse Medicaid beneficiaries, Plaintiffs have identified no provision of federal law that requires that factor to be considered in pre-approving state-directed payments.

While Plaintiffs rely extensively on the Third Circuit's decision in *Christ the King Manor, Inc. v. Secretary United States Department of Health & Human Services*, 730 F.3d 291 (3d Cir. 2013), to argue that CMS's pre-approval of the Final Preprint Application was arbitrary and capricious, *see* Pls. Opp. at 25-26, differences in the agency action challenged in that case instructively show why CMS's approval of the Final Preprint Application was consistent with 5 U.S.C. § 706(2).  While the instant case concerns CMS's pre-approval of a state-directed payment, which is governed by 42 C.F.R. § 438.6(c)(2), *Christ the King Manor* concerned the CMS's approval of an amendment to Pennsylvania's Medicaid plan reducing the rates paid to private nursing homes.  730 F.3d at 300-01.  Under the statutory provision governing that approval process, "[w]henever a State plan is submitted to the Secretary by a State for approval under subchapter I, X, XIV, XVI, or XIX, he shall . . . make a determination as to whether it conforms to the requirements for approval under such subchapter."  42 U.S.C. § 1316(a)(1); *see Christ the King Manor*, 730 F.3d at 297.  Within title 42, chapter 7, subchapter XIX lies 42 U.S.C. § 1396a, which provides that, subject to certain further restrictions, "[t]he Secretary shall approve any plan which fulfills the conditions specified in subsection (a)."  42 U.S.C. § 1396a(b); *see Christ the King Manor*, 730 F.3d at 297.  And among the conditions in 42 U.S.C. § 1396a(a) is one

> requir[ing] that a state Medicaid plan: "provide such methods and procedures relating to the utilization of, and the payment for, care and services available under the plan . . . as may be necessary to safeguard against unnecessary utilization of such care and services and *to assure that payments are consistent with efficiency, economy, and quality of care and are sufficient to enlist enough providers so that care and services are available under the plan* at least to the extent that such care and services are available to the general population in the geographic area."

*Christ the King Manor*, 730 F.3d at 307 (alteration in original) (quoting 42 U.S.C. § 1396a(a)(30)(A)).  Thus, in *Christ the King Manor* it was undisputed that 42 U.S.C. § 1396a(a)(30)(A) was "one of the statutory prerequisites a state plan must satisfy to receive federal approval, and thus federal funding."  *Id.*

If federal law prohibits CMS from approving a Medicaid plan unless it satisfies a particular criterion, then CMS's approval will be arbitrary and capricious if it grants approval without adequately considering that criterion.   Thus, since federal law requires the plan "to assure that payments are consistent with . . . quality of care," 42 U.S.C. § 1396a(a)(30)(A), the Third Circuit concluded in *Christ the King Manor* that:

> [s]o far as the record shows, Pennsylvania decided to reduce its cost-based per diem rates to the amount that it could afford to pay, without taking any steps to ensure that payments would still be consistent with quality of care and adequate access.  In approving that decision, HHS seems to have "entirely failed to consider" those "important aspect[s]" of [42 U.S.C. § 1396a(a)(30)(A)].

730 F.3d at 314 (quoting *Motor Vehicle Mfrs. Ass'n of U.S., Inc. v. State Farm Mut. Auto. Ins. Co.*, 463 U.S. 29, 43 (1983)).   CMS's approval was arbitrary and capricious because it failed to adequately consider a factor *that the Medicaid Act required it to consider*.  By contrast, Plaintiffs have failed to identify any provision of federal law requiring CMS to consider the factors that it did not consider when pre-approving the Final Preprint Application.   And no tension exists between *Christ the King Manor*'s holding that CMS acted arbitrarily and capriciously by not considering a factor that federal law requires it to consider and this Court's holding here that CMS did not act arbitrarily and capriciously by failing to consider a factor that federal law does not require it to consider.

In sum, CMS pre-approved the Final Preprint Application by considering whether it satisfied the criteria that must be met under the governing provisions of federal law for pre-approval to be granted, and Plaintiffs have not plausibly identified any error of judgment in CMS's conclusion that those criteria were satisfied.   Agency action may be set aside under 5 U.S.C. § 706(2)(A) as arbitrary and capricious either if the decision was not "based on a consideration of the relevant factors" or if "there has been a clear error of judgment."  *Kakar*, 29 F.4th at 132 (internal quotation marks omitted).  Neither is the case here.  Therefore, CMS's pre-approval of

the Final Preprint Application was not arbitrary and capricious, and it cannot be set aside under 5 U.S.C. § 706(2)(A).

### 2. Extra-Record Evidence

Lastly, the Court returns to Plaintiffs' motion for the admission of extra-record evidence. Both forms of extra-record evidence that Plaintiffs seek to admit—namely, expert testimony and the rate certifications New York submitted to CMS—pertain to actuarial soundness. Had the Court concluded that actuarial soundness is relevant to its review of CMS's pre-approval of the Final Preprint Application, these forms of evidence might well fall within one or both of the two exceptions Plaintiffs cite to the presumption that the Court's review should be limited to the administrative record. But because the Court has interpreted the Medicaid Act and its implementing regulations not to require CMS to consider actuarial soundness when pre-approving a state-directed payment, actuarial soundness does not constitute "an important aspect of the problem" that CMS failed to consider. Pls. Discovery Br. at 2 (internal quotation marks omitted). Evidence as to actuarial soundness therefore does not constitute relevant "background information" for the Court's "confront[ation] with complex issues." *Id.* (internal quotation marks omitted). Plaintiffs' motion for the admission of extra-record evidence is denied.

### III. Conclusion

For the foregoing reasons, the State Defendants' motion to dismiss is granted, the Federal Defendants' motion for summary judgment is granted, and Plaintiffs' motion for the admission of extra-record evidence is denied. Plaintiffs are, however, granted leave to file a second amended complaint as to the State Defendants in the event they are able to cure the pleading deficiencies identified in Part I. Should Plaintiffs decide to amend the Amended Complaint, they must file a second amended complaint within thirty days of this Opinion and Order. If Plaintiffs fail to file a second amended complaint within thirty days, and do not show good cause to excuse the failure to

do so, the Court will dismiss Plaintiffs' claims against the State Defendants with prejudice.  The

Clerk of Court is respectfully directed to substitute James V. McDonald and Amir Bassiri for Mary

T. Bassett and Brett R. Friedman, respectively, in this caption of this case, and to close the motions

pending at Docket Numbers 61, 63, 70, and 78.

     SO ORDERED.

Dated: July 10, 2023
     New York, New York

                                    JOHN P. CRONAN
                           United States District Judge